CIARDI CIARDI & ASTIN
Albert A. Ciardi, III, Esquire
Jennifer E. Cranston, Esquire
One Commerce Square, Suite 1930
2005 Market Street
Philadelphia, PA  19103
(215) 557-3550
(215) 557-3551 fax
aciardi@ciardilaw.com
jcranston@ciardilaw.com

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | CHAPTER 11 |
| FRAZER/EXTON DEVELOPMENT, LP, ET. AL.<br>Debtor. | Case No.:  11-14041<br><br>Judge:  Jean K. Fitzsimon |

**DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING THE FIRST AMENDED PLAN OF REORGANIZATION PROPOSED BY FRAZER EXTON DEVELOPMENT L.P. AND WHITELAND VILLAGE LTD., DEBTORS AND DEBTORS-IN-POSSESSION**

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THIS PLAN OF REORGANIZATION. THE DEBTOR BELIEVES THAT THIS PLAN OF REORGANIZATION IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE.  THE DEBTOR URGES THAT THE VOTER ACCEPT THIS PLAN.**

Dated: July 8, 2011

**Albert A. Ciardi, III, Esquire**
**Jennifer E. Cranston, Esquire**
**CIARDI CIARDI & ASTIN**
**One Commerce Square**
**2005 Market Street, Suite 1930**
**Philadelphia, PA  19103**
**Telephone: (215) 557-3550**
**Facsimile: (215) 557-3551**
aciardi@ciardilaw.com
jcranston@ciardilaw.com

## I.    <u>INTRODUCTION</u>

Frazer Exton Development, L.P. (the "Frazer Debtor") and Whileland Village, Ltd. (the "Whiteland Debtor") (hereinafter collectively referred to as the "Debtor"), provide this disclosure statement (the "Disclosure Statement") to all of their known Creditors and "Interest Holders" entitled to same pursuant to section 1125 of the United States Code, as amended (the "Bankruptcy Code ") in connection with the plan of reorganization (the "Plan") filed by the Debtor.    A copy of the Plan accompanies the Disclosure Statement.    The purpose of the Disclosure Statement is to provide creditors of the Debtors with such information as may be deemed material, important and necessary in order to make a reasonably informed decision in exercising the right to vote on the Plan.    The capitalized items used in this Disclosure Statement, if not defined herein, shall have the same meaning as indicated in the Plan.

**NO REPRESENTATION CONCERNING THE DEBTOR-IN-POSSESSION (INCLUDING THOSE RELATING TO FUTURE OPERATIONS, THE VALUE OF ASSETS, ANY PROPERTY, OR CREDITORS AND OTHER CLAIMS) INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED.**

On May 19, 2011, Frazer Exton Development, L.P, (the "Frazer Debtor") and Whiteland Village, Ltd. (the "Whiteland Debtor") (hereinafter collectively referred to as the "Debtor") commenced separate  bankruptcy cases by filing voluntary chapter 11 petitions under Chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code") in the Bankruptcy Court for the Eastern District of Pennsylvania and identified by bankruptcy case numbers 11-14041 and 11-14036 respectively.    On or about July ___, 2011, the Honorable Jean K. FitzSimon entered an Order authorizing the joint administration of the Frazer Debtor and the Whiteland Debtor.    Since the Filing Date, the Debtors have continued in the operation of its business as

debtor-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

## A.    **Purpose of this Document.**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process that the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)**            **WHO CAN VOTE OR OBJECT,**

**(2)**            **THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION,**

**(3)**            **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

**(4)**            **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

**(5)**            **THE EFFECT OF CONFIRMATION, AND**

**(6)**            **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own attorney to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. Capitalized terms not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan. The Plan is the legally operative document regarding the treatment of Claims and Interests and the terms and conditions of the Debtor's reorganization. Accordingly, to the extent that

3

there are any inconsistencies between the Plan and Disclosure Statement, the Plan provisions govern.

Bankruptcy Code Section 1125 requires a disclosure statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Bankruptcy Code section 1125(a) as "information of a kind, and in sufficient detail, about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the plan. The Bankruptcy Court determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Bankruptcy Code section 1124.

This Disclosure Statement is provided to each Creditor whose Claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor and to each interest holder of record as of the date of approval of this Disclosure Statement. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

**B.      Brief Explanation Of Chapter 11**

Chapter 11 is the principal business reorganization section of the Bankruptcy Code. Pursuant to Chapter 11, a Debtor is permitted to reorganize its business affairs for its own benefit and that of its creditors and other interest holders.

The objective of a Chapter 11 case is the formulation of a plan of reorganization of the Debtor and its affairs. Creditors are given an opportunity to vote on any proposed plan, and the plan must be confirmed by the Bankruptcy Court to be valid and binding on all parties. Once the plan is confirmed, all Claims against the Debtor which arose before the Chapter 11 proceeding was initiated are extinguished, unless specifically preserved in the Plan.

4

### C.   <u>Disclaimers</u>

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PLAN OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON DEBTOR, HOLDERS OF CLAIMS OR INTERESTS, OR THE REORGANIZED DEBTOR. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND THE STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN ARE MADE SOLELY BY OR AT THE INSTANCE OF THE DEBTOR.

NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  THE DEBTOR DOES NOT WARRANT OR PRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

CERTAIN OF THE INFORMATION PROVIDED, BY ITS NATURE, IS FORWARD LOOKING, CONTAINS ESTIMATES AND ASSUMPTIONS WHICH MAY PROVE TO BE FALSE OR INACCURATE AND CONTAINS PROJECTIONS WHICH MAY BE MATERIALLY DIFFERENT FORM ACTUAL FUTURE EXPERIENCES.   SUCH ESTIMATES AND ASSUMPTIONS ARE MADE FOR INFORMATIONAL PURPOSES ONLY.

PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY OR DESIRABILITY OF THE PLAN.

## II.  **VOTING PROCEDURE**

The Bankruptcy Court has reviewed this Disclosure Statement and entered an Order determining that these documents contained "adequate information" such that creditors can meaningfully evaluate the Plan.  A copy of the Order approving the Disclosure Statement is attached.  Only after creditors have had an opportunity to vote on the Plan will the Court consider the Plan and determine whether it should be approved or confirmed.

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to be returned to the following address in the enclosed envelope:

ALBERT A. CIARDI, III, ESQUIRE
JENNIFER E. CRANSTON, ESQUIRE
Ciardi Ciardi & Astin
One Commerce Square
2005 Market Street, Suite 1930
Philadelphia, PA 19103

BALLOTS MUST BE RECEIVED ON OR BEFORE **5:00 P.M. ON** _____, **2011** TO BE COUNTED IN THE VOTING.  BALLOTS RECEIVED AFTER THIS TIME WILL NOT BE COUNTED IN THE VOTING UNLESS THE COURT SO ORDERS.  THE DEBTOR RECOMMENDS A VOTE "FOR ACCEPTANCE" OF THE PLAN.

### A.  **Persons Entitled to Vote on Plan**

Only the votes of classes of Claimants and Interest holders which are Impaired by the Plan are counted in connection with confirmation of the Plan.  Generally, and subject to the specific provisions of Section 1124 of the Bankruptcy Code, this includes creditors who, under the Plan, will receive less than payment in full of their Claims.

6

In determining the acceptance of the Plan, a vote will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated, or who has timely filed with the Court a proof of claim which has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot Form does not constitute a proof of claim. If you are in any way uncertain if your Claim has been correctly scheduled, you may check the Debtor's Schedules which are on file in the Bankruptcy Court, but it is suggested that you file a proof of claim. The Clerk of the Bankruptcy Court will not provide this information by telephone.

## B.    Hearing on Confirmation

The Bankruptcy Court will set a hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. Each creditor will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of the Plan.

## C.    Acceptances Necessary to Confirm Plan

At the scheduled confirmation hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each impaired class. Under Section 1126 of the Bankruptcy Code, an impaired class is deemed to have accepted the Plan if at least 2/3 in amount and more than 1/2 in number of the Allowed Claims of class members who have voted to accept or reject the Plan have voted for acceptance of the Plan. Further, unless there is acceptance of the Plan by all members of an impaired class, the Bankruptcy Court must also determine that under the Plan class members will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such class members would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

### D.    Confirmation of the Plan without the Necessary Acceptances

The Plan may be confirmed even if it is not accepted by all of the impaired classes if the

Bankruptcy Court finds that the Plan, (1) does not discriminate unfairly against such class or

classes, (2) such class or classes will receive or retain under the Plan not less than the amount the

Claimant would receive if the Debtor was liquidated under Chapter 7; and (3) is fair and

equitable as to such class or classes as set forth in section 1129(b) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code requires that, among other things, the Claimants must

either receive the full value of their Claims or, if they receive less, no class with junior priority

may receive anything.  If the class of Unsecured Claims does not accept the Plan and the Plan

does not propose to pay the class their Allowed Claims in full, no junior class may retain their

equity interest, unless the shareholders contribute new money related to their participation in

equity. In short, this provision provides that creditors are entitled to priority over stock holders

against the property of an insolvent corporation, to the extent of their debts.  The stockholder's

interest in the property is subordinate to the rights of the creditors; first of secured and then of

unsecured creditors.   The Debtor may choose to use the New Value Exception to obtain

confirmation of this Plan.  The amount of such new value is not yet determined.

The Debtor-in-Possession may, at its option, choose to rely upon this provision to seek

confirmation of the Plan if it is not accepted by an impaired class or classes of Creditors.

## III.    BACKGROUND OF THE DEBTOR

### A.    History and Cause of Bankruptcy

#### i.    The Frazer Exton Development, L.P. Debtor

Frazer/Exton Development, L.P. ("FED" or "Frazer") was formed in October, 1998 for

the purpose of purchasing contaminated land, remediating the contamination and developing an

office park.  FED's initial major owners were a local office park developer and an environmental

8

firm.  The partnership acquired a vacant 79 acre Superfund site in late 1998 in Exton,

Pennsylvania from Cyprus Amax, a major chemical and mining company.  Four years later, a

neighboring 21 acres was purchased from PECO.  This now 100 acre site has 25 acres in West

Whiteland Township and 75 acres in East Whiteland Township.

The Exton, PA office development market was very weak from 1998 through 2004 and

the US EPA approval process took much longer than originally anticipated.  In late 2003, the

owners of Whiteland Village, Ltd. (Whiteland) approached the owners of FED to see if the 100

acre parcel was for sale.  In April 2004, the 100 acre site was sold for $7,000,000 to a new entity,

KRW Pennsylvania, LP, that was created by the owners of Whiteland to hold Frazer/Exton

Development, L.P and Whiteland Village, Ltd.    Because the land was contaminated, it was

decided that Whiteland would lease the land from FED once the contamination was remediated.

This lease would allow Whiteland to be the developer and operator of the Continuing Care

Retirement Community (CCRC) without being exposed to Superfund liability.

FED began the cleanup in August, 2005.  This was very unusual as almost all cleanups

start after receipt of a Federal Court Consent Decree.  However, FED and Whiteland wanted to

open the CCRC development as soon as possible, so FED began the cleanup "at risk" for having

to redo its work.  On March 31, 2006, the US EPA issued the Record of Decision (ROD) which

instructed FED on how to clean up the contamination.  The cleanup work to date was covered

under the ROD, but FED was still "at risk" for future changes.  The ROD estimated the clean up

to cost $13,900,000.  FED owned an insurance policy that would pay up to $16,500,000 in clean

up costs over a $3,500,000 self insured retention, so FED believed it was covered.  On May 24,

2006, East Whiteland Township approved a zoning change to permit a CCRC in the Township.

Later in 2006, East Whiteland Township approved the CCRC overlay on our 75 acre parcel in

East Whiteland Township.

9

In mid 2006 Whiteland and FED were introduced to Sovereign Bank as a potential lender for the Whiteland Village Project. Sovereign Bank was one on the leading lenders in the Senior Housing Industry and specialized in CCRC's.  In November 2006 Whiteland and FED received a term sheet for $15 million with a $1 million interest reserve.  However, prior to closing, the loan was increased to a total of $23 million to take out Commerce Bank (Whiteland's previous lender) and to increase the interest reserve. After the remediation loan closed on January 16, 2007, FED and Whiteland worked with Sovereign Bank to secure the required construction financing for the project.

On June 29, 2007 Sovereign Bank and HSH Nordbank, a Germany based bank that also specialized in Senior Housing (hereinafter collectively referred to as the "Banks"), jointly issued a term sheet for $181.5 million to Whiteland Village Ltd. (the CCRC license holder, developer and deposit holder) and Frazer/Exton Development, LP ( the land owner).  Whiteland and FED moved forward with completing all the due diligence reports and appraisals required by the Banks for the loan to close.  The Banks confirmed that the all the reports had come in satisfactorily to the Bank and we were expecting to close construction financing in April or May of 2008.  Bank-required pre-sales and equity was also in place. This construction Loan was expected to take out the Remediation Loan of $23 million at close and to supply the funds to construct the CCRC.

On a March, 2008 conference call with the Banks, Frazer and Whiteland were informed that neither Sovereign Bank nor HSH Nordbank would live up to their signed term sheet.

In June of 2008 Sovereign provided a term sheet for a $125 million loan, which at the time would not meet the projects needs. Sovereign also increased the remediation Loan to $29 million and extended the loan further.

On July 25, 2008 the United States of America and FED entered into a Consent Decree.

The three years of "at risk" cleanup was approved and no longer "at risk." FED continued to

clean up the site although costs had escalated well over the ROD estimate of $13,900,000.

In February 2009, Whiteland and FED met with Sovereign's new representatives to review the

project status and to present a plan regarding securing the construction loan. The plan to be

presented involved the need to bring in additional capital to satisfy the increasingly stringent

underwriting criteria of the banking industry. The plan, as outlined, would have had Sovereign

Bank substantially repaid with proceeds from the sale of residential units in the First Phase of the

Whiteland project. Sovereign indicated that it would need a few weeks to provide a response.

Based on all indications from Sovereign representatives that Sovereign was moving

forward in reviewing Whiteland and FED's plan and their desire to continue with the Whiteland

project, Whiteland continued to expend funds on the project. These expenses were in excess of

$220,000.00 per month. FED also continued spending funds on the cleanup. However, in a

complete reversal of position, Sovereign informed Whiteland that the bank was calling the loan

and expected full payment by July 31, 2009. This demand was made on July 27, 2009.

On July 31, 2009, having no opportunity to comply or even respond to Sovereign's demand in

the four (4) days notice provided, Whiteland and FED requested a sixty (60) day forbearance.

On or about August 12, 2009, Sovereign granted a sixty (60) day forbearance conditioned on

Whiteland or FED paying $615,000.00 to bring the interest payments current, fund an interest

reserve and pay a forbearance fee.

In October of 2009, a pre-negotiations agreement was signed between Sovereign Bank

and Whiteland/FED indicating that both parties agreed to work toward a formal forbearance

agreement. Over the next several months the parties actively negotiated a forbearance

agreement. At the same time, FED and Whiteland continued to look for a joint venture partner

or buyer for the project and continued to market the project and clean up the site.

11

During early 2010, FED and Whiteland negotiated the sale of a portion of the project to Makemie Ridge, an affiliate of Philadelphia Presbytery Homes Inc (Presby) and signed the Agreement of Sale (the "Agreement") on August 12, 2010. This Agreement had several sales milestone targets. FED and Whiteland renegotiated a Revised Agreement with Presby in early 2011, which was signed on May 12, 2011 and the Revised Agreement was subsequently presented to Sovereign Bank.

Meanwhile, FED finished the site cleanup in October, 2010. That success is to be followed up by 15 years of monitoring groundwater downstream from the site to insure the work performed was actually working as expected. The EPA can reopen this cleanup at their discretion and make FED perform additional work if the groundwater is not getting cleaner. Total costs came in well over expectations at $37,670,235.

Negotiations between Whiteland/FED and Sovereign Bank were not making progress. Ultimately Sovereign Bank would not approve Presby's Revised Agreement.

The Debtors' inability to negotiate a successful Development and Buildout of the CCRC and sale of certain parcels of surrounding real property lead to the Debtors' Chapter 11 filing to preserve their collective estates for the benefit of all creditors.

## ii.    The Whiteland Village, Ltd. Debtor.

The history of the Whiteland Village, Ltd. Debtor largely mirrors that of the Frazer Exton Debtor and will not be repeated where unnecessary. However, and with regard to the Whiteland Village, Ltd. Debtor, Whiteland Village Ltd ("Whiteland" or the "Partnership") was formed November 8, 2000 for the purpose of a land purchase and the ultimate development of a Continuing Care Retirement Community (CCRC) in the Exton, Pennsylvania area. The partnership acquired a 32 acre site for the development in West Whiteland Township on January 26, 2001 with cash and a loan from First National Bank of Chester County for $1,500,000. The

12

partnership worked for over 2 years to get zoning approval for the property.  While in the process

of seeking zoning approval, the partners agreed to start marketing the project and filed and

received a Certificate of Authority to develop a CCRC in the state of Pennsylvania on October

16, 2001 from the Pennsylvania Department of Insurance.  During this process the partners

funded the capital needed to move the project forward.  Marketing went very well with over 100

pre sales, as evidenced by a $5,000 deposit, achieved by March of 2003.  However, West

Whiteland Township voted against the requested zoning change on April 1, 2003. The

partnership made the decision to not shut down the marketing of the CCRC, but to look for

another site in the area to develop.  In April 2004, the partners located a 100 acre site less than 1

mile away that was owned by Frazer Exton Development, LP (FED).  This site had 25 acres in

West Whiteland Township and 75 acres in East Whiteland Township.  It was thus decided that

Whiteland would purchase FED and pursue zoning approvals in East Whiteland Township

In order to continue to fund the project in November, 2004 the partners entered into two

loan agreements with Commerce Bank.  The new loans would allow for them to pay off the First

National Bank of Chester County Loan and to continue funding marketing costs. One loan

agreement was secured by the 32 acre site in West Whiteland Township and was in the amount

of $3,250,000 with a maturity date of 10/31/06. The other loan agreement was unsecured and

was made to the partners in the amount of $2,750,000.  Both loans were subsequently extended

and eventually taken out with the Sovereign Bank Financing in 2007.

See Disclosure Statement Section III.A.i.

### B.      Financial Condition of Debtor

The Debtors' assets consist primarily of the real property located at 15 South Bacton Hill

Road, Malvern, Pennsylvania (the "FED Property") and 755 Livingston Lane, Exton,

Pennsylvania (the "Whiteland Property").  The Frazer Debtor values its property located at 15

South Bacton Hill Road as "unknown." See Debtor's Schedule A. The Whiteland Debtor values its property located at 755 Livingston Lane at approximately $4,000,000. See Debtor's Schedule A. These values are based on the property as-is, in current market conditions, approved but unimproved.

## LIQUIDATION ANALYSIS

On a liquidation basis, the Debtor believes property owned by the Debtor will not achieve anything close to the Class 2 claim. The Debtor believes a liquidation of the Debtor will yield zero distribution for unsecured creditors.

**C.**        **Management of the Debtor**

Day-to-Day Management of the Reorganized Debtor will be undertaken by Daniel Sevick. Moreover, Roskamp Management Company ("RMC") will act as the developer for the new Continuing Care Retirement Community contemplated in the Debtor's Plan. RMC and/or its owners have developed ten (10) large full size Continuing Care Retirement Communities or Retirement Centers in Florida, Pennsylvania, Michigan and Arizona. RMC will supervise all aspects of the development including the supervision of the general contractor, management of the development budget and the management of the construction draw process.

**D.**        **Significant Events Post-Filing**

Since the Petition Date, the Debtor filed Motion for Joint Administration on May 24, 2011. See Docket Item 27. Subsequently thereto, the Debtor filed a Motion for an Order Approving the Form Manner and Notice of Bidding Procedures, Authorizing the Sale of Real Estate, Assuming and Assigning various Contracts and Granting Related Relief (the "Sale Motion") on May 25, 2011. See Docket Item 30. On June 13, 2011, the Debtor filed a Motion approving the Post-Petition Loan of RMC to the Debtor. See Docket Item 40. Finally, the

14

Debtor filed an Application to Employ MacElree Harvey, Ltd. as Special Counsel on June 28, 2011. See Docket Item 62.

On or about _____, 2011, the Debtor filed a Complaint, pursuant to Federal Rule of Bankruptcy Procedure 7001 and 11 U.S.C. § 105(a) and 362(a), seeking an injunction and/or extension of the scope of the automatic stay to include: (1) Robert Roskamp; (2) Philip Kaltenbacher; (3) Paul Woodruff; (4) KRW Pennsylvania, L.P.; and (5) Roskamp Management Company, LLC.  See Adversary Proceeding No. _____.

### E.      Actual and Projected Recovery of Preferential or Fraudulent Transfers.

The Debtor believes that no preferential or fraudulent transfer actions will be filed.

### F.      Post Bankruptcy Operations

Since the Filing Date, the Debtor has filed all operating reports and has paid all required fees to the United States Trustee.  The Debtor will continue to file all reports and pay all fees as they become due.

### G.      Projection Assumptions

The Plan Budget attached as **Exhibit "A"** is the same as the Plan Budget attached as Exhibit "A" to the Plan.

## IV.    SUMMARY OF PLAN OF REORGANIZATION

### A.      What Creditors and Interest Holders Will Receive Under the Proposed Plan.

The Plan classifies Claims and Interests in various classes.  The Plan states whether each class of Claims or Interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.  The following is a brief summary of the Plan and is qualified in its entirety by the full text of the Plan itself.  The Plan, if confirmed, will be binding upon the Debtor, its creditors and shareholders.  All creditors are urged to carefully read the Plan.

15

## B.    Unclassified Claims.

Certain types of Claims are not placed into voting classes. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has <u>not</u> placed the following Claims in a class:

### 1.    Administrative Expenses and Fees

Administrative expenses are Claims for fees, costs or expenses of administering the Debtor's chapter 11 cases which are allowed under the Bankruptcy Code section 507(a)(1), including all professional compensation requests pursuant to section 330 and 331 of the Bankruptcy Code.

### i.    <u>Time for Filing Administrative Claims</u>

The holder of an Administrative Claim, other than (i) a Fee Claim or (ii) a liability incurred and paid in the ordinary course of business by the Debtor, must file with the Bankruptcy Court and serve on the Debtor and its counsel, notice of such Administrative Claim within (30) days after the Confirmation Date. Such notice must include at a minimum (i) the name of the holder of the Claim, (ii) the amount of the Claim and (iii) the basis of the Claim. Failure to file this notice timely and properly shall result in the Administrative Claim being forever barred and discharged.

### ii.    <u>Time for Filing Fee Claims</u>

Each professional person who holds or asserts an Administrative Claim that is a Fee Claim incurred before the Effective Date shall be required to file with the Bankruptcy Court a fee application within sixty (60) days after the Effective Date. Failure to file the fee application timely shall result in the Fee Claim being forever barred and discharged.

16

### iii.    Allowance of Administrative Claims

An Administrative Claim with respect to which notice has been properly filed pursuant to Section 4.1 (a) the Plan shall become an Allowed Administrative Claim if no objection is filed after thirty (30) days lapses from the filing and service of notice of such Administrative Claim. If an objection is filed within such (30) day period, the Administrative Claim shall become an Allowed Administrative Claim only to the Extent allowed by Final Order.

### iv.    Payment of Allowed Administrative Claim

Each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Claim upon the Effective Date, (ii) such other treatment as may be agreed upon in writing by the Debtor and such holder as long as no payment is made thereon prior to the Effective Date so long as such modification of treatment made by the Debtor and any holder of an allowed administrative claim does not impair any other class, or (iii) as may be otherwise ordered by the Court, provided that an Administrative Claim representing a liability incurred in the ordinary course of business by the Debtor may be paid in the ordinary course of business.

### v.    Professionals Fees Incurred After the Effective Date

Any professional fees incurred by the Debtor after the Effective Date must be approved by the Debtor and, thereafter, paid.  Neither Bankruptcy Court approval, nor consent of creditors whose claims may be impaired by the payment of post-confirmation Professional Fees, is required.  Any dispute which may arise with regard to professional fees after the Effective Date shall be submitted to the Bankruptcy Court, which shall retain jurisdiction to settle these types of disputes.

### 2.    Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code section 507(a)(8).  The Bankruptcy Code requires that each holder of such a

17

section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash payments, over a period not exceeding six (6) years from the date of the assessment of such tax.

**C.    Treatment of Classes of Claim**

The Plan divides Claims and Interests into various separate classes. Under the Plan, there are five (5) separate classes of creditors (classes 1 through 5) and one class of Interest Holders (Class 6), who hold the partnership interests of the Debtor.

**Class 1.    Priority Tax Claims.**    Class 1 is not impaired.    Except as otherwise provided herein, the treatment and consideration to be received by Class 1 shall be in full settlement, satisfaction, release and discharge of its respective Claims and Liens.

Class 1 Priority Claims shall receive one hundred (100%) percent of their Claim over sixty (60) months commencing on the Effective Date.    Post-confirmation interest at the rate of seven (7%) percent will be paid on the principal portion of the Claim.

**Class 2.    Secured Claim of Sovereign Bank.**

**1.    Background**

On or about January 16, 2007, the Debtor and Sovereign executed a Loan Agreement ("Loan Agreement") for up to $23 million.    The Loan Agreement specifically provided that the proceeds of the Remediation Loan would be used for cleanup costs associated with the environmental remediation and the remainder to refinance the existing Whiteland Debtor's debt as well as loan interest and closing costs.    Although the Loan Agreement specifically contemplated that the initial loan would cover the site's remediation work, Sovereign and the Whiteland Debtor also contemplated that Sovereign would follow through with a construction loan for the project.    As part of the Loan Agreement, Roskamp Management Company, LLC, KRW, Pennsylvania, L.P., Robert Roskamp, Paul Woodruff and Philip Kaltenbacher (collectively, the "Guarantors") signed a payment guarantee in favor of Sovereign.

18

A First Amended Loan Agreement was executed June 20, 2008.  Among other changes, Sovereign increased the loan amount to $29 million.

A Second Amended Loan Agreement was executed on December 29, 2008.  The Second Amendment extended the maturity date of the Remediation Loan to April 15, 2009.  On or about August 12, 2009, the Debtor and Sovereign negotiated a forbearance agreement in exchange for a $615,000 forbearance fee.  In October of 2009, a pre-negotiations agreement was signed between Sovereign Bank and Whiteland/FED indicating that both parties agreed to work toward a formal forbearance agreement.  Over the next several months the parties actively negotiated a forbearance agreement.  At the same time, FED and Whiteland continued to look for a joint venture partner or buyer for the project and continued to market the project and clean up the site.

## 2.    Treatment.

The Debtor proposes the following treatment for the Class 2 claim:

On or about January 1, 2012 and upon the anticipated closing of the sale of that certain thirty (30) acre parcel of the Debtor's real property as well as an eleven (11) acre parcel of the Debtor's real property more fully described in the Debtor's Sale Motion and the Agreement of Sale attached thereto as Exhibit B (Docket Item 28), $7,450,000 in net sale proceeds will be paid to Sovereign in one lump sum.

Upon the completion of Phase 1, Unit 1 in September 2013, $2,700,000 will be released from escrow and paid to Sovereign.  Moreover, Sovereign will receive an additional $2,000,000 or $200,000 from the sale of each of Ten (10) Villas sold in Phase 1A with an anticipated return date of September 30, 2013.

On or about March 31, 2014, Sovereign will receive an additional $1,000,000 or $100,000 from the sale of each of Ten (10) Villas sold in the Second half of Phase 1A.

On or before June 30, 2014, the Debtor will pay to Sovereign $4,000,000 from the Sale of the Whiteland 32 Acre Site described fully in the Site Plan attached hereto as Exhibit B.

On or about June 30, 2016, the Debtor will pay to Sovereign $4,000,000 from the proceeds of Phase 2 Development.

On or before June 30, 2018, the Debtor shall sell its remaining real property to the purchaser referenced in its proposed Sale Motion (Docket Item 28) or a comparable Non-CCRC Operator Buyer and generate the remaining $4,000,000 payment to Sovereign in satisfaction of the full underlying debt.

The Class 2 Claim shall be adequately protected during the Sale Period by the following:

a. The Debtor shall use all Net Sale Proceeds to maintain, insure and secure the Property, satisfy all costs of administration.

b. A lien in the Plan Fund to the same extent priority and validity as existed pre-petition and subject to the claims and defenses raised in the Chester County Court of Common Pleas Litigation and Bankruptcy Litigation.

c. The continued investment by ownership of the Debtor in operating, marketing or management costs of the Property which is estimated over the Sale Period at approximately $1,589,000.

The Class 2 claim shall bear interest from the Effective Date at the contract rate of 0% for three years and 3% per annum thereafter.  Distributions to Class 2 shall equal the Class 2 Secured Claim plus the accrued interest.  This interest will accrue monthly on the outstanding principal balance on the Class 2 Secured Claim commencing the first calendar month after the Effective Date.  From the Petition Date until the Effective date, the Class 2 Secured Claim shall not be entitled to interest and all payments made by Debtor from the Plan Fund shall act to reduce the principal balance of the Class 2 Secured Claim.

The Class 2 Claims shall be allowed in the amount determined in the Bankruptcy Litigation which shall also determine the extent of lien priority. The Class 2 claim shall be paid in full from the Plan Fund up to the amount of the Allowed Claim and in priority determined in the Bankruptcy Litigation. All distributions from the Plan Fund will be made on the Distribution Date other than the payments to Class 2.

Net Sale Proceeds shall be used as set forth in the Plan Budget attached hereto as Exhibit "A."

### 3.    Pre-payment.

The Debtor may pre-pay the Class 2 Secured Claim at any time after the Effective Date with no penalty or exit fee. Further, at the Debtor's option, the Debtor can direct Sovereign to assign its loan documents, mortgage and security documents to a third party providing funds for the full satisfaction of the Sovereign Class 2 Secured Claim existing at time of payoff upon receipt of the balance of the Sovereign Class 2 Secured Claim.

**Class 3.**      **Secured Claim of Paul Risk Associates, Inc.** Class 3 is impaired. Class 3 consists of the Secured Claim of Paul Risk Associates, Inc. Except as otherwise provided herein, the treatment and consideration to be received by Class 3 shall be in full settlement, satisfaction, release and discharge of its respective Claims and Liens. The Secured Claim of Paul Risk Associates, Inc. is $1,992,627.00. This claim shall be partially assumed by the Buyer, pursuant to the Agreement of Sale attached to the Debtor's Sale Motion (Docket Item 28). Upon closing, the Buyer will determine to what extend this claim will be assumed. Any remaining portion will be treated as a general unsecured claim by the Debtor.

**Class 4.**      **Secured Claim of the Commonwealth of Pennsylvania, Department of Community and Economic Development.**

Class 4 consists of the Secured Claim of the Commonwealth of Pennsylvania,

21

Department of Community and Economic Development. Class 4 is impaired. Except as otherwise provided herein, the treatment and consideration to be received by Class 4 shall be in full settlement, satisfaction, release and discharge of its respective Claims and Liens. This claim shall be assumed by the Buyer of the 11 acre parcel, pursuant to the Agreement of Sale attached to the Debtor's Sale Motion (Docket Item 28). Upon closing, the Buyer will determine to what extend this claim will be assumed. Any remaining portion will be treated as a general unsecured claim by the Debtor.

**Class 5.** **Secured Claim of ECOR Solutions, Inc.** Class 5 is impaired. Class 5 consists of the Secured Claim of ECOR Solutions, Inc. Except as otherwise provided herein, the treatment and consideration to be received by Class 5 shall be in full settlement, satisfaction, release and discharge of its respective Claims and Liens. The Secured Claim of ECOR Solutions, Inc. is $1,703,355. This claim shall be assumed by the Buyer, pursuant to the Agreement of Sale attached to the Debtor's Sale Motion (Docket Item 28). Upon closing, the Buyer will determine to what extent this claim will be assumed. Any remaining portion will be treated as a general unsecured claim by the Debtor.

**Class 6.** **General Unsecured Claims.** Class 6 is impaired. Class 6 contains the general unsecured creditors of the Debtor. Except as otherwise provided herein, the treatment and consideration to be received by Class 6 shall be in full settlement, satisfaction, release and discharge of its respective Claims and Liens. With the exception of the US EPA, Class 6 shall receive a onetime pro rata distribution from the Plan Fund upon the payment in full of the Class 2 Claim. The US EPA claim shall be assumed by the Buyer, pursuant to the Agreement of Sale attached to the Debtor's Sale Motion (Docket Item 28).

**Class 7. Interest Holders.** Class 7 is impaired. All existing membership interests shall be retained but the holders shall not receive any distribution on account of the interest in the

22

Debtor until Classes 2, 3, 4, 5 and 6 have been paid in full.

### D.  **Estimation of Distribution to Unsecured Creditors**

It is estimated that Unsecured Creditors will receive a substantial distribution upon the payment in full of the Class 2 Claim.

### E.  **Implementation of the Plan**

1.  **Possession of Assets.**  All of the assets of the Debtor shall be sold and liquidated in the ordinary course of the Debtor's business in accordance with the Plan.

## V.  **PROVISIONS GOVERNING DISTRIBUTIONS, DISCHARGE AND GENERAL PROVISIONS**

### A.  **Distributions**

Daniel Sevick shall be the disbursing agent ("Disbursing Agent") herein.  The Disbursing Agent shall have the sole and exclusive right to make the distributions required by the Plan.  The Disbursing Agent may hold or invest the funds in one or more accounts, provided that all investments shall be made in accordance with section 345 of the Bankruptcy Code.  The disbursing Agent shall serve without bond and shall receive no compensation for his duties as the Disbursing Agent.

### 1.  **Delivery of Distributions**

Distributions and deliveries to holders of Allowed Claims will be made at the addresses set forth on the proofs of claim filed by the holders (or at the last known address).  If any holder's distribution is returned as undeliverable, no further distributions to the holder will be made unless and until the Reorganized Debtor is notified of the holder's then current address, at which time all missed distribution will be made to the holder without interest.  After one year

from the payment date all unclaimed property will become property of the Reorganized Debtor, and the Claim of any holder with respect to such property will be discharged and forever barred.

### 2.   Means of Cash Payment

Cash payments made pursuant to the Plan will be in United States funds, by check drawn on a domestic bank or by wire transfer from a domestic bank.  All cash distributions will be made by Debtor.

### 3.   Time Bar to Cash Payments

Checks issued by the Debtor in payment of Allowed Claims will be null and void if not cashed within ninety (90) days of the date of their issuance.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to which the check originally was issued.  Any Claim relating to a voided check must be made on or before the later of (i) the first anniversary of issuance, or (ii) ninety (90) days after the date the check was voided.  After that date, all Claims relating to a voided check will be discharged and forever barred and shall be revested in the Reorganized Debtor.

### 4.   Setoffs

The Debtor may, but will not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of the Claim, any Claims of any nature whatsoever the Debtor may have against the Claimant, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver of release by the Debtor of any such claim the Debtor may have against such Claimant.

### 5.   De Minimis Distributions

No cash payment of less than twenty-five dollars ($25.00) will be made by the Disbursing Agent to any creditor unless a request is made in writing to the Reorganized Debtor to make such a payment by the Effective Date of the Plan.

### 6.      Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

### B.      Confirmation/Miscellaneous

1.      Except as may be otherwise provided herein, upon the Confirmation Date, all Claims against the Debtor and Debtor-in-Possession shall be satisfied, discharged and released in full; and all holders of Claims and Creditors shall be precluded from asserting against the Debtor, its assets, properties or interest held by it, any other future Claim based upon any transaction or occurrence of any nature that occurred prior to the Confirmation Date.

2.      Upon confirmation, title to all assets and properties whatsoever of the Debtor and the Debtor-in-Possession shall be retained by and revested in the Reorganized Debtor free and clear of Claims, Liens, encumbrances, security and equitable interests, except as may be otherwise provided by this Plan.  The order confirming the Plan shall be a judicial determination of the discharge of the liabilities of a Claim against the Debtor and Debtor-in-Possession, except only as may be otherwise provided for this Plan.  Confirmation of the Plan shall satisfy all Claims arising out of any Claim settled and satisfied under the terms of the Plan.

3.      After the Effective Date, the Reorganized Debtor shall be entitled to operate its property without any restrictions of the Bankruptcy Code and without any supervision of the Bankruptcy Court.

4.      Any check, including interest earned, that is unclaimed for ninety (90) days after distribution will be deemed null and void.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to which the check

25

originally was issued.  Any Claim relating to a voided check must be made on or before the later

of (i) the first anniversary of the Effective Date, or (ii) ninety (90) days after the date the check

was voided.  After the date, all Claims relating to a voided check will be discharged and forever

barred and shall be revested in the Reorganized Debtor.

5.    No default shall be declared under this Plan, other than Class 2 defaults,

unless any payment due under this Plan shall not have been made within  thirty (30) days after

written notice to the Debtor and counsel for the Debtor of failure to make payment when due

under the Plan.

6.    <u>11 U.S.C. § 1146(a) and the transfer of the Real Estate</u>.  The transfer of all

real estate under the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.

## VI.    **EFFECTS OF CONFIRMATION**

### A.    **Discharge of Claims; Injunction**

Except as otherwise expressly provided in the Plan, the entry of the Confirmation

order shall act to, among other things, permanently enjoin all Persons who have held, hold or

may hold Claims of or Interests in the Debtor as of the Confirmation Date (a) from commencing

or continuing in any manner any action or other proceeding of any kind with respect to any such

Claim or Interest against the Debtor, (b) from the enforcement, attachment, collection or

recovery by any manner or means of any judgment, award, decree, or order against the Debtor or

the Property of the Debtor with respect to any such Claim or Interest, (c) from creating,

perfecting or enforcing any encumbrance of any kind against the Debtor thereof, or against the

property of the Debtor with respect to any such Claim or Interest, (d) from creating, perfecting or

enforcing any encumbrance of any kind against the Debtor thereof, or against the property of the

Debtor with respect to any such Claim or Interest, and (e) from asserting any setoff, right of

subrogation, or recoupment of any kind against any obligation due from the Debtor thereof, or

26

against the property of the Debtor, with respect to any such Claim or Interest. To the extent, however, that the Debtor defaults under the terms of the Plan and such default is not cured within ten (10) days after the Debtor and its counsel receive notice of the default as provided under Section 8.3 of the Plan, the injunction shall be void.

### B.    Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in Chapter 11 cases pursuant to section 362(a) of the Bankruptcy Code or otherwise, shall remain in full force and effect until the Effective Date at which time the injunction under section VIII a shall be in force.

### C.    Injunction Against Interference With Plan

No entity may commence or continue any action or proceeding, or perform any act to interfere with the implementation and consummation of the Plan and the payments to be made hereunder.

## VII.    CRAMDOWN PROVISIONS AND CONFIRMATION REQUEST

In the event that sufficient votes to confirm said Plan are not received, the Debtor requests confirmation of the Plan pursuant to the provisions to the provisions of section 1129(b) of the Bankruptcy Code.

## VIII.    MODIFICATION OF THE PLAN

### A.    Pre-Confirmation Modification

At any time before the Confirmation Date, the Plan may be modified by the Debtor provided that the Plan, as modified, does not fail to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code.  In the event that there is a modification of the Plan, then the Plan as modified shall become the Plan.

### B.   Pre-consummation Modification

At any time after the Confirmation Date of the Plan, but before substantial consummation of the Plan, the Plan may be modified by the Debtor, provided that the Plan, as modified, does not fail to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code.  The Plan, as modified under this section, becomes a Plan only if the Court, after notice and hearing, confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

### C.   Non-Material Modifications

At any time, the Debtor may, without the approval of the Court, so long as it does not materially or adversely effect the interest of Creditors, remedy any defect or omission, or reconcile any such inconsistencies in the Plan or in the Confirmation Order, as such matters may be necessary to carry out the purposes, intent and effect of this Plan.

### IX.   RETENTION OF JURISDICTION

The Court shall retain jurisdiction of the case after the Confirmation Date for the following purposes:

(a)   to determine any and all objections in the allowance of claims and amendments to schedules;

(b)   to classify the Claim of any Creditor and to re-examine Claims which have been allowed for purposes of voting, to determine such objections as may be filed to Claims;

(c)   to determine any and all disputes arising under or in connection with the Plan, the sale of any of the Debtor's assets, collection or recovery of any assets;

(d)   to determine any and all applications for allowance of compensation and reimbursement of expenses herein;

(e)    to determine any and all pending applications for rejections of executory contracts and unexpired leases and the allowance of any claims resulting from the rejection thereof or from the rejection of executor contracts or unexpired leases pursuant to the Plan;

(f)    to determine any and all applications, adversary proceedings and contested and litigated matters pending in the case as of , or after, the Confirmation Date;

(g)    to determine any and all proceedings for recovery of payments pursuant to any Cause of Action;

(h)    to modify any provision of the Plan to the full extent permitted by the Bankruptcy Code;

(i)    to correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes intent and effect of the Plan;

(j)    to determine such other matters which may be provided for in the Confirmation Order as may be authorized under the provisions of the Bankruptcy Code;

(k)    to enforce all provisions under the Plan; and

(l)    to enter any order, including injunctions, necessary to enforce the terms of the Plan, the powers of the Debtor under the Bankruptcy Code, this Plan and as the Court may deem necessary.

## X.    CAUSES OF ACTION

### A.    Suits, Etc.

The Debtor reserves the right to initiate or continue any litigation or adversary proceeding permitted under the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure with respect to any Cause of Action, except if provided to the contrary herein.

29

1.   **Litigation**.  Except as otherwise provided in section 13.2 of the Plan, the Debtor reserve the right to initiate or continue any litigation or adversary proceeding permitted under the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure with respect to any Cause of Action.   The Debtor specifically preserves the CCP Litigation and Bankruptcy Litigation.

B.   **Powers**

The Debtor shall have the right to settle, compromise, sell, assign, terminate, release, discontinue or abandon any cause of action from time to time in its discretion.

## XI.   **OBJECTIONS TO CLAIMS**

A.   **Objection to Claims**

Notwithstanding the occurrence of the Confirmation Date or the Effective Date, the Debtor may object to the allowance of any claim not previously allowed by final order whether or not a Proof of Claim has been filed and whether or not the Claim has been filed and whether or not the Claim has been scheduled as non-disputed, non-contingent and liquidated.  Prior to Confirmation, the Debtor will file with the Court a list of all the proof of claims to which the Debtor intends to object. All such objections shall be filed within sixty (60) days of the Effective Date. The Debtor reserves the right to amend this list prior to the date when the Confirmation Order becomes a Final Order.

B.   **Contested Claims**

Notwithstanding any other provision of this Plan, a Contested Claim will be paid only after allowance by the Court or upon stipulation of the Debtor and the Claimant involved, as

approved by the Court. If allowed, the Contested Claim will become an Allowed Claim and shall be paid on the same terms as if there had been no dispute. The need for resolution of Contested Claims will not delay other payments under the Plan. No distribution shall be made to a Contested Claim until it is Allowed.

### XII.  CHOICE OF LAW

Except to the extent superseded by the Bankruptcy Code or other federal law, the rights, duties and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the choice of law rules thereof.

### XIII.  EXCULPATION

Following the Effective Date, neither the Debtor nor any of its officers, directors, members, employees or agents, nor any professional persons employed by any of the foregoing parties, shall have or incur any liability or obligation to any entity for any action taken at any time or omitted to be taken at any time in connection with or related to the formation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any agreement or document created or entered into, or any action taken or omitted to be taken in connection with the Plan or this Chapter 11 case; provided, however, that the provisions of this article shall have no effect on the liability of any entity that would otherwise result from action or omission to the extent that such action or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

### XIV.  MISCELLANEOUS

#### A.  Payment of Statutory Fees

All fees payable pursuant to section 1930 of Title 28 of the United States Code, as determined by the Court at the hearing pursuant to section 1128 of the Bankruptcy Code, will

31

be paid on or before the Effective Date.  Moreover, all post-confirmation quarterly fees shall be paid by the Reorganized Debtor as and when they become due until the Bankruptcy Case is closed.

## B.    Discharge of Debtor

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor, any of their assets or properties and the Debtor's Estate.  Except as otherwise provided in this Plan (i) on the Effective Date, all Claims against and Interests in the Debtor will be satisfied, discharged and released in full and (ii) all Persons shall be precluded from asserting against Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date.

Notwithstanding the foregoing, the discharge granted by 11 U.S.C. §1141(d) is and modified as to the secured or priority tax debt provided for in this Plan, and the discharge of any secured or priority tax debt under this Plan shall not be effective until all secured or priority taxes provided for in the Plan have been paid in full.

## C.    Discharge of Claims

Except as otherwise provided in this Plan or in the Confirmation Order, the rights afforded in this Plan and the payments and distributions to be made under the Plan shall be in complete exchange for, and in full satisfaction, discharge and release of, all existing debts and Claims of any kind, nature or description whatsoever against the Debtor, the Estate or any of their assets or properties; and upon the Effective Date, all existing Claims against the Debtor, the Estate and all of their assets and properties will be, and be deemed to be, exchanged, satisfied,

32

discharged and released in full; and all holders of Claims will be precluded from asserting against Reorganized Debtor, its successors or its Assets or properties any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date, whether or not the holder filed a proof of claim.

### D.    Effect of Confirmation Order

Except as provided for in this Plan, the Confirmation Order will be a judicial determination of discharge of the Debtor from all debts that arose before the Confirmation Order and any liability on a Claim that is determined under section 502 of the Bankruptcy Code as if such Claim had arisen before the Confirmation Date, whether or not a proof of claim based on any such date or liability is filed under section 501 of the Bankruptcy Code and whether or not a Claim based on such debt or liability is allowed under section 502 of the Bankruptcy Code.

### E.    Severability

Should any provision in this Plan be determined to be unenforceable, that determination will in no way limit or affect the enforceability and operative effect of any provision of the Plan.

### F.    Successors and Assigns

The rights and obligations of any person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of that Person.

### G.    Binding Effect

The Plan will be binding upon and inure to the benefit of the Debtor, its Creditors, the holders of Equity Interests, and their respective successors and assigns.

### H.    Governing Provisions

33

Where a provision of this Plan contains a summary or description of one or more provision of any of the documents attached to the Plan as an Exhibit that conflicts or appears to conflict with any such provision of an Exhibit, the provision of the Exhibit will govern.

## I.    Filing of Additional Documents

On or before substantial consummation of this Plan, the Debtor will file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## J.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued and distributions made pursuant to the Plan, the Debtor will comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions made pursuant to the Plan will be subject to any such withholding and reporting requirements.

Dated: July 8, 2011

FRAZER EXTON DEVELOPMENT, LP
WHITELAND VILLAGE, LTD

By:    /s/ Daniel Sevick
       Daniel Sevick

CIARDI CIARDI & ASTIN

By:
       Albert A. Ciardi, III, Esquire
       Jennifer E. Cranston, Esquire
       One Commerce Square
       2005 Market Street, Suite 1930
       Philadelphia, PA  19103
       Attorneys for the Debtor

34