# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **In re:** | : | |
| | : | CHAPTER 11 |
| **FRAZER/EXTON DEVELOPMENT, L.P., et al.** | : | |
| | : | Case No. 11-14041 (JKF) |
| | : | (Jointly Administered) |
| Debtors. | : | |

## DEBTORS' MOTION TO REOPEN BANKRUPTCY CASES AND REIMPOSE THE AUTOMATIC STAY IN CONNECTION WITH FORECLOSURE ACTION

Frazer/Exton Development, L.P. ("Frazer") and Whiteland Village, Ltd. ("Whiteland"; collectively with Frazer, the "Debtors"), the debtors in the above-captioned jointly administered cases, hereby request that this Court enter an Order: (1) reopening the Debtors' bankruptcy cases for, *inter alia*, the purposes of permitting the Debtors to pursue relief from the Court's Order Granting Motion to Approve Settlement Agreement and the underlying Settlement Agreement pursuant to Federal Rule of Civil Procedure 60 ("Rule 60"), as incorporated by Bankruptcy Rule 9024, and modifying the confirmed Plan of Reorganization (the "Plan") pursuant to 11 U.S.C. § 1127(b); and (2) reimposing the automatic stay in connection with the foreclosure action pending against the Debtors. In support thereof, the Debtors state as follows:

## INTRODUCTORY STATEMENT

1. The Debtors seek to reopen their bankruptcy cases in order to, among other things, pursue relief from a settlement agreement with Sovereign Bank ("Sovereign"), their principal secured creditor, and modification of their confirmed plan.

2. The settlement agreement with Sovereign, and the plan that resulted from it, were the product of discovery misconduct and, likely, fraud by Sovereign. After the confirmation of the plan and the closure of the Debtors' bankruptcy cases, it was revealed in another case

pending in this district that, while the Debtors were in litigation with Sovereign, Sovereign was engaged in a company-wide pattern of egregious discovery violations – including the intentional withholding of "*directly relevant*, proverbial 'smoking-gun' type documents." *See In re 400 Walnut Assocs., L.P.*, Case No. 10-16094, 2012 WL 2839633 (Bankr. E.D. Pa. July 11, 2012) (Raslavich, C.J.) (a copy of which is attached hereto as Exhibit A).

3. In his opinion in *400 Walnut Associates,* Chief Judge Raslavich noted that "[o]ne can only speculate as to the number of cases in which justice has been denied because of Sovereign's misconduct." *Id.* at *29. This is such a case.

4. Accordingly, the Debtors respectfully request that this Court reopen their bankruptcy cases so that they can seek relief from the settlement agreement based upon Sovereign's discovery misconduct and modify their plan accordingly. If the Court reopens the Debtors' cases, the Debtors also intend to seek emergency discovery in order to determine whether the documents that Sovereign failed to produce during the Debtors' cases implicate Sovereign in connection with the wrongful repudiation of their term sheet for the construction loan, as described below.

5. In addition, the Debtors also respectfully request that this Court reimpose the automatic stay in connection with Sovereign's foreclosure action pending against both Debtors.

## BACKGROUND

### Factual Background

6. In mid-2006, Sovereign – then considered one of the leading lenders for senior citizen housing – was introduced to the Debtors as a potential lender for their "Whiteland Village" project (the "Project"), their effort to develop a 100-acre, 393-unit continuing care retirement community in East and West Whiteland Township, Pennsylvania.

7. On or about January 16, 2007, the Debtors and Sovereign executed a loan agreement for up to $23 million (the "Remediation Loan"), the purpose of which was, primarily, the payment of clean-up costs associated with the environmental remediation of the site that the Debtors planned to develop (the "FED Site") for the Project.

8. As collateral for the Remediation Loan, Debtors executed a mortgage and security agreement in favor of Sovereign on the FED Site and on a separate piece of property, the "Whiteland Site" (together with the FED Site, the "Property").

9. As additional security for the Remediation Loan, Roskamp Management Company, LLC, Robert G. Roskamp, Paul Woodruff, Phil Kaltenbacher, and KRW Pennsylvania, L.P. (collectively, the "Guarantors") entered into guaranty agreements with Sovereign, guaranteeing the Remediation Loan. The Guarantors are each direct or indirect owners or affiliates of Frazer.

10. The parties to the Remediation Loan and the Guarantors understood that the Remediation Loan was to be repaid from the financing proceeds of the next phase of the Project, *i.e.*, the construction financing.

11. In June 2007, Sovereign and HSH Nordbank AG ("Nordbank") issued a term sheet pursuant to which they would provide $181.5 million in construction financing to the Debtors for the Project (the "Term Sheet").

12. After execution of the Term Sheet, the Project proceeded, with Sovereign and Nordbank obtaining appraisals and completing due diligence reviews. Nordbank's appraiser valued the completed Project at more than $250 million.

13. Meanwhile, the Debtors proceeded with the environmental remediation and extensive marketing efforts.

14. Ultimately, the Debtors invested more than $70 million as the Project moved toward the Debtors' closing of the $181.5 million construction loan with Sovereign and Nordbank.

15. In March 2008, however, the Debtors were informed that neither Sovereign nor Nordbank would provide the $181.5 million construction loan contemplated by the Term Sheet. Moreover, the Debtors were informed that Nordbank planned to exit entirely from the project.

16. In June 2008, having repudiated the Term Sheet, Sovereign provided a new term sheet for a $125 million construction loan.

17. On June 20, 2008, the Debtors and Sovereign entered into a First Amendment to the Remediation Loan, increasing the loan amount by $6 million, to $29 million and, as additional collateral, executed another mortgage in favor of Sovereign on the Property.

18. The First Amendment to the Remediation Loan also extended the maturity date of the Remediation Loan to October 15, 2008.

19. On December 29, 2008, the Debtors and Sovereign extended the maturity date of the Remediation Loan to April 15, 2009.

20. Given Sovereign's ostensible continuing support of the Project, the Debtors in reliance on that support continued to invest significant resources into the Project and, as Sovereign was fully aware, refrained from pursuing other financing opportunities for the Project.

21. However, Sovereign issued a default letter on April 30, 2009 and issued a demand for full repayment of the Remediation Loan on July 28, 2009, giving the Debtors only four days to pay off the Remediation Loan in full.

22. On August 12, 2009, the Debtors, the Guarantors, and Sovereign negotiated a forbearance agreement in exchange for the Debtors' and Guarantors' payment of a $615,000 forbearance fee to Sovereign.

23. Sovereign then commenced a mortgage foreclosure action against the Debtors on October 7, 2010 in the Chester County Court of Common Pleas, No. 10-12277 (the "Foreclosure Action").

24. Also on October 7, 2010, Sovereign commenced an action against the Guarantors in the Chester County Court of Common Pleas, No. 10-12278 (the "Guaranty Action").

## Procedural History of These Bankruptcy Cases

25. On May 19, 2011, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

26. On or about July 13, 2011, this Court entered an Order Approving the Joint Administration of the Debtors' respective cases. (Doc. No. 87.)

27. Throughout the chapter 11 cases, the Debtors managed their property as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

28. On November 16, 2011, the Debtors, the Guarantors, and Sovereign entered into a Settlement and Forbearance Agreement (the "Settlement Agreement") based upon, *inter alia,* the proposed sale of a portion of the Debtors' property (the "Sale Property") to Makemie at Whiteland, the successful bidder at a court-approved auction pursuant to Section 363 of the Bankruptcy Code (the "Makemie Transaction").

29. By order dated November 17, 2011 (the "Order"), this Court approved the Settlement Agreement.

5

30. On August 30, 2011, Sovereign had moved for relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to allow it to proceed with the Foreclosure Action. (Doc. No. 119.)

31. As part of the settlement negotiations, on September 27, 2011, the Court granted Sovereign relief from the automatic stay, but expressly conditioned that relief on "Sovereign Bank approving and executing a settlement agreement . . . that contains all material terms put into the record at the hearing held on September 15, 2011 at 11:30 a.m." (Doc. No. 141.) The Court's order providing Sovereign relief from the automatic stay provided further that "Sovereign Bank shall have the right to pursue its rights in the Collateral, without further Order from this Court, immediately upon the occurrence of" various events, including, *inter alia*, "[t]he proposed sale of the Frazer/Exton Property . . . to Makemie at Whiteland does not close on or before March 30, 2012."

32. On February 22, 2012 (the "Confirmation Date"), this Court entered an order (the "Confirmation Order") confirming the Debtors' Second Amended Plan of Reorganization (the "Plan"), which provided for the treatment of Class 2, the secured claim of Sovereign, in accordance with the terms of the Settlement Agreement. The terms of the Settlement Agreement (denominated the "Sovereign Agreement" in the Plan) were incorporated into the Plan by reference.

33. The Confirmation Order provided, among other things, as follows:

> In so confirming this plan, it is agreed by the debtors and so ordered that the liens of Sovereign Bank shall remain as liens against the assets of the debtors, as described in the confirmed plan, until Sovereign Bank's secured claim is paid in full in accordance with the terms of the confirmed plan, which incorporates the parties' Settlement Agreement dated November 16, 2011.

34. On May 30, 2012, this Court entered a Final Decree closing this bankruptcy case.

**Post-Confirmation Occurrences**

35. Since the Confirmation Date, a number of events have occurred that have resulted in the filing of this Motion.

36. *First*, due to circumstances beyond the Debtors' control, in April 2012, the Makemie Transaction did not close as anticipated by the Settlement Agreement and the Plan.

37. As a result, the Debtors were unable to fully consummate the Plan and make all of the payments contemplated by the Settlement Agreement and the Plan. Sovereign pressed forward with the Foreclosure Action and the Guaranty Action in the Chester County Court of Common Pleas.

38. *Second*, Sovereign was caught red-handed engaging in a company-wide pattern of egregious discovery violations – including the intentional withholding of "*directly relevant*, proverbial 'smoking-gun' type documents" in a separate bankruptcy case pending at the same time as this case. *See In re 400 Walnut Assocs., L.P.*, Case No. 10-16094, 2012 WL 2839633 (Bankr. E.D. Pa. July 11, 2012) (Raslavich, C.J.) On July 11, 2012, Chief Judge Raslavich sanctioned Sovereign and noted: "One can only speculate as to the number of cases in which justice has been denied because of Sovereign's misconduct." *Id.* at *29.

39. In response to the discovery violations revealed in *400 Walnut Associates*, newly retained counsel for the Debtors in the Foreclosure Action and the Guaranty Action, Steven M. Coren, Esquire, a shareholder at Kaufman, Coren & Ress, P.C. (collectively, "KC&R") and the Debtors' special counsel here,[1] reviewed the documents produced by Sovereign in these bankruptcy cases. Based on that review, it appears highly likely that numerous "directly relevant" and perhaps even "smoking-gun type" documents were not produced by Sovereign.

---

[1] KC&R also serves as special counsel for the debtor in *400 Walnut Associates*.

40. For example, the Debtors served discovery requests on Sovereign during their bankruptcy proceedings that requested "[a]ny and all documents comprising and/or relating to the Debtors' loan(s) file with Sovereign Bank" and "[a]ll documents relating to the relationship between HSH Nordbank and Sovereign Bank relating to Debtors loan or the Property." However, the documents ultimately produced by Sovereign to the Debtors were nearly devoid of (1) any correspondence between Sovereign and Nordbank from the time of Nordbank's first involvement, on or before January 2007, through its exit in March 2008, and (2) any correspondence and other internal Sovereign documents for most of the calendar year 2007, an ominous sign given that the Remediation Loan closed on January 16, 2007, and discussions surrounding the follow-up $181.5 million construction financing were ongoing thereafter.[2] Additionally, the privilege log produced by Sovereign lists numerous documents that appear not to be privileged and therefore should have been produced.

41. Prior to Chief Judge Raslavich's holding in *400 Walnut Associates*, the Debtors believed that Sovereign had turned over all non-privileged, relevant documents to the Debtors and that, to the extent that Sovereign withheld documents, Sovereign had identified such documents on its privilege log. Now that the Debtors have learned that Sovereign was engaged in a company-wide practice of withholding documents <u>and</u> not identifying such documents on its privilege log at the time that Sovereign produced documents to the Debtors, it is clear to the Debtors that Sovereign has engaged is the same egregious discovery misconduct in these cases, just as it had in *400 Walnut Associates.*

---

[2] By way of example, Sovereign's April 27, 2007 "Proposal for a [$206.9] million Construction Financing for Whiteland Village's initial two phases of construction, a planned Continuing Care Retirement Community in East Whiteland Township, PA," was only produced because it was attached to a March 12, 2008 email requesting a copy of it. It is implausible that this document was created in an information vacuum, or that there are not numerous, additional documents relating to its formulation, negotiation, and the reaction to it.

## RELIEF REQUESTED

42. In light of the foregoing, the Debtors respectfully request that this Court enter an Order: (a) reopening the Debtors' bankruptcy cases for, *inter alia,* the purposes of (1) permitting the Debtors to pursue relief from the Order and the Settlement Agreement pursuant to Rule 60; and (2) modifying the Plan pursuant to Section 1127(b) of the Bankruptcy Code; and (b) reimposing the automatic stay pursuant to Section 362 of the Bankruptcy Code.

## GROUNDS FOR RELIEF

43. Section 350(b) of the Bankruptcy Code provides: "A case may be reopened in the Court in which such case was closed to administer assets, to accord relief to the Debtor, or for other cause." 11 U.S.C. § 350(b). Rule 5010 of the Federal Rules of Bankruptcy Procedure further provides: "A case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code." Fed. R. Bankr. P. 5010.

44. Section 350(b) "gives the Court broad discretion in the reopening of a case." *Collier on Bankruptcy* ¶ 350.03. That discretion may be exercised to reopen a case to modify a reorganization plan. *See id.* ¶ 350.03[5] (citing *In re Case*, 937 F.2d 1014, 1019 (5th Cir. 1991)); *see also In re Midlands Utility, Inc.*, 251 B.R. 296, 302 (Bankr. D.S.C. 2000) (reopening Chapter 11 case to allow debtor to move for relief from the terms of a substantially consummated plan pursuant to Fed. R. Civ. P. 60(b)).

45. As set forth above, Chief Judge Raslavich has already found that, during the pendency of these bankruptcy cases, Sovereign was engaged in a company-wide pattern of discovery misconduct. Neither on the Confirmation Date nor on the date on which this bankruptcy case was closed were the Debtors aware of this misconduct.

46. In order to remedy this misconduct, the Debtors seek to reopen their bankruptcy cases so that they may: (1) seek relief from the Order and the Settlement Agreement under Rule

60 based upon Sovereign's discovery misconduct; and (2) modify their Plan to restructure the sale of the Sale Property and the Debtors' other real and personal property and, if appropriate, pursue claims against Sovereign in connection with Nordbank's/Sovereign's wrongful repudiation of the Term Sheet.

47. Additionally, the Debtors have retained KC&R as special counsel[3] to represent the Debtors in connection with, *inter alia*: (1) asserting claims against Nordbank and, possibly, Sovereign – likely to exceed $200 million in value – arising out of their wrongful repudiation of the Term Sheet; (2) seeking emergency discovery from Sovereign in connection with those claims, as to which the statute of limitations may expire in May 2013; and (3) filing a motion and, if necessary, an independent action against Sovereign under Rule 60 in connection with proceedings to invalidate the Settlement Agreement.

---

[3] If this Court reopens the Debtors' bankruptcy cases, it does not appear that the Debtors will be required to file an application to retain either general bankruptcy counsel or special counsel because both Debtors will be in the post-confirmation stage of their bankruptcy proceedings. *See, e.g., In re Tri-L Corp.*, 65 B.R. 774, 778 (Bankr. D. Utah 1986) ("reorganized debtor was free to employ attorneys and other professional persons without obtaining authority from the bankruptcy court to do so"). However, if the Court believes that the Debtors are required to file retention applications for their general bankruptcy counsel and special counsel, the Debtors will reconsider their position.

In addition, in accordance with Section 329 of the Bankruptcy Code and Bankruptcy Rule 2016(b), the Debtors' counsel are filing disclosures of compensation, which reflect, *inter alia,* the following: (1) the fees and expenses of the Debtors' general bankruptcy counsel are payable by the Debtors and guaranteed by Philip D. Kaltenbacher ("Kaltenbacher") and Robert G. Roskamp ("Roskamp"); and (2) the Debtors' special counsel will receive the greater of either the regular hourly fees incurred by special counsel or 10% of all sums recovered against Nordbank. The fees and expenses due and owing by the Debtors to KC&R are also guaranteed by Kaltenbacher and Roskamp.

## The Debtors' Bankruptcy Cases Should Be Reopened In Order To Permit The Debtors To Seek Relief From The Order And Settlement Agreement Pursuant To Rule 60

48. If the Debtors' bankruptcy cases are reopened, the Debtors intend to file a motion under Rule 60(b) to obtain relief from the Order and the Settlement Agreement, or, in the alternative, an independent action for fraud against Sovereign Bank under Rule 60(d)(1).[4]

49. Specifically, Rule 60(b)(3) provides:

> (b) On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . . (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party.

50. In order to prevail on a motion filed under Rule 60(b)(3), the Third Circuit has held that:

> the movant must establish that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting his case. *See Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1341 (5th Cir.1978). "**Failure to disclose or produce evidence requested in discovery can constitute Rule 60(b)(3) misconduct.**" *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983) (emphasis added).

51. While the movant must demonstrate such misconduct or fraud based upon clear and convincing evidence, *Brown v. Pennsylvania R.R. Co.*, 282 F.2d 522, 527 (3d Cir. 1960) (citations omitted), that evidentiary standard will be met here, where key findings against Sovereign have already been made by Chief Judge Raslavich in *400 Walnut Associates* and

---

[4] The Debtors reserve all of their rights to bring any other type of action against Sovereign in connection with the execution and approval of the Settlement Agreement, including, but not limited to, an action for fraud against the court pursuant to Rule 60(d)(3) or a motion under Rule 60(b)(6).

11

Sovereign's discovery misconduct in these bankruptcy cases reflects Sovereign's company-wide pattern of egregious discovery violations.

52. Although Rule 60(c)(1) provides that a motion under Rule 60(b)(3) must be filed "no more than a year after the entry of the judgment or order or date of the proceeding," the Third Circuit has recognized that the statute of limitations under Rule 60(c)(1) may be extended by equitable tolling. *See Perry v. Pennsylvania*, 328 F. App'x. 785, 787 (3d Cir. 2009) (citing *Santos v. United States*, 559 F.3d 189, 197 (3d Cir. 2009) ("Equitable tolling can avoid the bar of a statute of limitations when sufficiently inequitable circumstances preclude filing for Rule 60 relief in a timely manner under Rule 60(c)(1).")).

53. Specifically, the Third Circuit has found that "equitable tolling may be appropriate if (1) the defendant has actively misled the plaintiff, (2) if the plaintiff has 'in some extraordinary way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum." *Kocian v. Getty Refining & Marketing Co.*, 707 F.2d 748, 753 (3d Cir. 1983) (citations omitted).

54. Moreover, the Supreme Court has explained that the doctrine of equitable tolling "is read into every federal statute of limitations" and explicitly recognized that equitable tolling extends the applicable statute of limitations until the underlying fraud is actually discovered. *Holmberg v. Armbrecht,* 327 U.S. 392, 396-97 (1946) ("And so this Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.'"). *See also In re Benjamin's-Arnolds, Inc.*, No. 90-6127, 1997 WL 86463 (Bankr. D.

Minn. Feb. 28, 1997) ("The Court notes that . . . it is arguable that Rule 60(b)(3) would be applicable to this case because the doctrine of equitable tolling would act to toll the one-year limitations period until the time the fraud is actually discovered.").

55. In the case at hand, clear and convincing evidence of Sovereign's misconduct exists based upon: (1) Sovereign's indefensible failure to disclose or produce critical evidence requested by the Debtors during discovery in the underlying bankruptcy proceeding, and (2) Chief Judge Raslavich's findings that, during the pendency of these bankruptcy cases, Sovereign was engaged in a company-wide pattern of discovery misconduct. In addition, under the doctrine of equitable tolling, the one-year statute of limitations under Rule 60(c)(1) for filing a Rule 60(b)(3) motion should be tolled until the Debtors' discovery of Sovereign's misconduct in September 2012 because Sovereign actively misled the Debtors during discovery by failing to turn over key documents, which is consistent with the findings by Chief Judge Raslavich in *400 Walnut Associates*.

56. In addition, if these cases are reopened, the Debtors may also file an independent action against Sovereign under Rule 60(d)(1) for fraud. Specifically, Rule 60(d)(1) provides:

> (d) Other Powers to Grant Relief. This rule does not limit a court's power to:
>
> (1) entertain an independent action to relieve a party from a judgment, order, or proceeding.

57. In order to prevail on an independent action under Rule 60(d)(1), the petitioner must demonstrate that relief under Rule 60(d)(1) is necessary to avoid a "grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 47 (1998).

58. However, with regard to an independent action for fraud under Rule 60(d)(1), the Third Circuit has held that "the elements of a cause of action for [fraud] in an independent action are not different from those elements in a Rule 60(b)(3) motion, and that the [one year] time limit

on such a motion does not apply to an independent action." *Averbach v. Rival Manufacturing Co.*, 809 F. 2d 1016, 1022-23 (3rd Cir. 1987).

59. The Third Circuit has also found that, when the statute of limitations for filing a motion under Rule 60(b) has expired, the movant may file an independent action under Rule 60(d), which is subject only to laches or the underlying statute of limitations related to the cause of action alleged in the independent action.

> If the right to make a motion is lost by the expiration of the time limits fixed in these rules, the only other procedural remedy is by a new or independent action to set aside a judgment upon those principles which have heretofore been applied in such an action. Where the independent action is resorted to, the limitations of time are those of laches or statutes of limitations. Fed. R. Civ. P. 60(b) advisory committee note.
>
> The laches or statute of limitations to which the Advisory Committee Note refers are to the governing time bars under the law which give rise to the independent cause of action.

*Id.* at 1020.

60. The statute of limitations for a common law claim of fraud in Pennsylvania is two years. *See* 42 Pa. Cons. Stat. Ann. § 5524(7). Thus, the Debtors have sufficient time to file an independent action for common law fraud against Sovereign since the statute of limitations for such claim will not expire until, at the earliest, November 2013.

61. Based upon the foregoing, the Debtors have a reasonable basis for filing, and are likely to succeed in obtaining relief under, a Rule 60(b) motion or an independent action under Rule 60(d)(1). Since the Debtors can only obtain Rule 60(b) relief from this Court, it is critical that the Debtors' bankruptcy cases be reopened in order to prevent manifest injustice to the Debtors, who were actively misled by Sovereign during the Debtors' bankruptcy proceedings.

## The Debtors' Bankruptcy Cases Should Be Reopened In Order To Allow Debtors To Modify Their Plan Pursuant To Section 1127

62. Section 1127(b) permits "[t]he proponent of a plan or the reorganized debtor" to "modify such plan at any time after confirmation of such plan and before substantial consummation of such plan." In this case, where the Makemie Transaction was not accomplished and none of the Debtors' property has been sold, the Plan has not been substantially consummated. The Court may thus modify the Plan pursuant to 11 U.S.C. § 1127(b). *See, e.g.*, *In re Temple Zion*, 125 B.R. 910, 914 (Bankr. E.D. Pa. 1991) ("[S]ince the sale to McCracken, which is the centerpiece of the Plan has never occurred, it is apparent that 'substantial consummation' of the Plan has not been effected here. The Debtor is therefore free to modify its Plan.").

63. The Debtors intend to modify the Plan in two respects. First, the Debtors intend to modify the Plan to restructure the sale of the Sale Property and to provide for the continued liquidation of the Debtors' assets in order to pay creditors, although over a longer period of time than previously contemplated. The shorter deadlines in the original Plan were the result of the Settlement Agreement with Sovereign, which was the product of Sovereign's discovery abuses and likely fraud. Providing a longer time-frame for the liquidation of all of the Debtors' assets would allow the Debtors to obtain the full value of the assets, rather than the fire-sale values that would result under the time-frame Sovereign imposed.

64. For instance, since the collapse of the Makemie Transaction, the Debtors have come to realize that the Sale Property may be more valuable if sold for some use other than a continuing care community. In order to effectuate such a sale, however, the Debtors would have to seek rezoning of the Sale Property, which will take some time to secure. Modifying the Plan

to provide such time would maximize the value received for the Sale Property and benefit the estates and their creditors.

65. Second, to the extent that the emergency discovery sought by the Debtors from Sovereign demonstrates that the Debtors have a cause of action against Sovereign, the Debtors will modify the Plan to allow them to pursue litigation directly against Sovereign. As set forth above, the Plan and the Settlement Agreement – including particularly any release of claims against Sovereign – were procured through, *inter alia*, Sovereign's discovery misconduct and, likely, fraud, as described above. The Plan should be modified to eliminate any release of Sovereign and allow the Debtors' to pursue such claims.

66. In addition, the Plan will be modified to provide, *inter alia*, that: (1) the Debtors will pursue claims/litigation against Nordbank (the "Nordbank Litigation"); (2) Kaltenbacher and Roskamp will guarantee and provide current funding for the counsel fees and related costs and expenses associated with the Nordbank Litigation; and (3) the net proceeds of the Nordbank Litigation, after payment and reimbursement of counsel fees and related costs and expenses associated with the Nordbank Litigation, will be used to pay the Debtors' creditors.

## **Specific Factors Under Section 350**

67. Additionally, the factors used to guide the exercise of the Court's discretion in considering reopening a closed bankruptcy case weigh heavily in favor of reopening this case. Those factors are the following:

> (1) the length of time that the case was closed;
>
> (2) whether a non-bankruptcy forum, such as state court, has the ability to determine the issue sought to be posed by the debtor;
>
> (3) whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate

>
> forum to determine the rights, post-bankruptcy, of the parties;
>
> (4) whether any parties would be prejudiced were the case reopened or not reopened;
>
> (5) the extent of the benefit which the debtor seeks to achieve by reopening; and
>
> (6) whether it is clear at the outset that the debtor would not be entitled to any relief after the case were reopened.

*In re Padilla*, 365 B.R. 492, 503 (Bankr. E.D. Pa. 2007).

68. This bankruptcy case has been closed since May 30, 2012, a period of only seven months. Three years has been found previously to be "a relatively substantial, but not inordinately lengthy" amount of time and did not prevent a case from being reopened. *See id.* at 504 n.22.

69. A non-bankruptcy forum cannot modify the Plan. To the extent that the issues raised in the reopened cases could also be determined by a state trial court, "[i]t makes more sense for the bankruptcy issues raised by the Debtor[s] to be determined by the bankruptcy court – a specialized court far more familiar with bankruptcy practice, procedure and substantive concepts – than a state trial court of general jurisdiction." *Id.* at 504 n.23.

70. Sovereign will not be prejudiced by the reopening of the cases, and the Debtors would be severely prejudiced if they are not reopened. As set forth above, the Debtors' primary asset and the focus of the current Settlement Agreement and Plan – the Sale Property – was to be sold, funding the Plan, but the sale fell through. The Debtors' proposed modifications to the Plan would permit the Debtors to successfully reorganize, making use of this key asset.

71. Moreover, it is Sovereign's misconduct that led the Debtors to enter into the Settlement Agreement and to seek confirmation of the Plan in the first place. The only conceivable harm to Sovereign is the delay in its ability to foreclose on its loan to the Debtors –

which continues to be secured by real property. Such delay pales in comparison the harm to the Debtors if they are not permitted an opportunity to pursue their remedies against Sovereign and successfully reorganize.

72. The Debtors seek to achieve a successful reorganization, allowing them to pay all of their creditors. This benefit is not only monetarily large, but also fulfills the purpose of Chapter 11. The Debtors are reasonably likely to succeed in modifying the Plan, and, in light of the facts above, they should be permitted the opportunity to do so.

73. Accordingly, the Debtors respectfully request that their cases be reopened for, *inter alia,* the purposes of modifying the Plan and permitting the Debtors to pursue relief pursuant to Federal Rule of Civil Procedure 60 from the Order and the Settlement Agreement.

### Reimposition Of The Automatic Stay In Connection With The Foreclosure Action

74. In addition, this Court should immediately reimpose the automatic stay of the Foreclosure Action, because reimposition of the stay is appropriate under the usual equitable standard.

75. Based upon the clear evidence of Sovereign's discovery misconduct and the Debtors' ability to modify their Plan, which has not yet been substantially consummated, the Debtors have a substantial likelihood of obtaining relief from the Order and Settlement Agreement and successfully modifying the Plan. Accordingly, the Debtors likely will be able to successfully reorganize. Given this likelihood of success, the Debtors believe that the automatic stay should be reimposed to stay the Foreclosure Action in order to allow the Debtors to pursue reorganization in an orderly fashion.

76. In addition, the Debtors will suffer irreparable injury if the Foreclosure Action is not stayed because they will not able to reorganize successfully and maximize the return to all of

their creditors. Specifically, the properties subject to foreclosure are – in addition to potential claims against Nordbank and Sovereign – the most valuable assets of the Debtors and disposition of those assets will be central to the reorganization of the Debtors (as it was under the Settlement Agreement and previously confirmed Plan). The Debtors have no adequate remedy at law if the Foreclosure Action is not stayed. Furthermore, the Bankruptcy Court is the most appropriate, and in fact only, forum to decide the issues to be raised by the Debtors upon the reopening of their bankruptcy case, *i.e.*, the modification of the Plan and their Rule 60 litigation. Finally, if the Foreclosure Action is allowed to continue and the Debtors must defend it, they will incur unnecessary and non-recoverable legal costs – expenses that would be obviated by modification of the Plan to, among other things, permanently enjoin Sovereign's actions against the Debtors.

77. Moreover, the balance of harms and equities favors staying the Foreclosure Action. As set forth above, it is Sovereign's discovery misconduct that led the Debtors to enter into the Settlement Agreement and seek confirmation of the Plan in the first place. The only conceivable harm to Sovereign is delay in its ability to proceed against the Debtors' real property securing its claims. Since such property is real estate that will retain most or all of its value over time, the harm resulting from such delay pales beside the harm to the Debtors if they are not permitted an opportunity to successfully reorganize.

78. Finally, the public interest also favors staying the Foreclosure Action pending the Debtors' reorganization. For the reasons explained above, staying the Foreclosure Action would promote the likelihood that the Debtors can successfully reorganize and is therefore in the public interest. Furthermore, the public interest will be served by remedying Sovereign's egregious discovery violations – and, likely, fraud on the Debtors– through their actions described above.

79. As a result of the foregoing, the Debtors request that this Court enter an order immediately staying the Foreclosure Action and enjoining Sovereign from foreclosing on or otherwise interfering with the Debtors' interest in their real property pending further order of this Court.

WHEREFORE, the Debtors request that this Court enter an Order substantially in the form attached hereto.

Dated: January 22, 2013

> HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
>
> By: /s/ Joseph A. Dworetzky
>   Joseph A. Dworetzky
>   Ashely M. Chan
>   Matthew A. Hamermesh
>   One Logan Square, 27th Floor
>   Philadelphia, PA 19103
>   (215) 568-6200
>
> *Bankruptcy Counsel for the Debtors*
>
> KAUFMAN, COREN & RESS, P.C.
>
> By: /s/ Steven M. Coren
>   Steven M. Coren
>   Benjamin M. Mather
>   Andrew J. Belli
>   Two Commerce Square
>   Suite 3900
>   2001 Market Street
>   Philadelphia, PA 19103
>   (215) 735-8700
>
> *Special Counsel for the Debtors*