## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| **Frazer/Exton Development, L.P., et al.** | : | |
| **Debtors.** | : | **Case No. 11-14041(JKF)** |
| | | **Jointly Administered** |

## MEMORANDUM OPINION

BY:   JEAN K. FITZSIMON
      United States Bankruptcy Judge

Before the Court is the Debtors' Motion to Reopen Bankruptcy Cases and

Reimpose the Automatic Stay in Connection with Foreclosure Action ("Motion").

The Debtors are Frazer/Exton Development, L.P. ("Frazer") and Whiteland

Village, Ltd. ("Whiteland").  The Motion is vigorously opposed by Sovereign

Bank, N.A. ("Sovereign") with whom the Debtors entered into a settlement

agreement ("Settlement Agreement") during their bankruptcy cases.  Sovereign

was the Debtors' largest creditor.

The Debtors seek to reopen their bankruptcy cases, pursuant to

11 U.S.C. § 350(b), in order to obtain relief from the Settlement Agreement and

their confirmed plan of reorganization ("Plan") which resulted therefrom.

Motion ¶ 2.  The Debtors contend that the Settlement Agreement is the product of

discovery misconduct or fraud by Sovereign because, in responding to the

Debtors' document requests in their bankruptcy cases, Sovereign only searched

and produced documents from one out of three of its sources of electronically stored information.

Since the Court approved the Settlement Agreement by Order dated November 17, 2011 ("Order"), the Debtors must obtain relief from the Order to modify or undo the settlement. Accordingly, if the Court grants the Debtors' Motion, the Debtors intend to seek relief from the Order by filing a motion under Fed. R. Civ. P. 60(b)(3) and/or, in the alternative, filing an independent action for fraud against Sovereign pursuant to Fed. R. Civ. P. 60(d)(1).[1] If successful in obtaining relief from the Order, then the Debtors will seek to modify their Plan pursuant to 11 U.S.C. § 1127(b).

The Debtors' request for reimposition of the stay has to do with a pre-petition mortgage foreclosure action ("Foreclosure Action") which Sovereign filed against the Debtors in state court. The Debtors seek to have the stay reimposed with regard to the Foreclosure Action to prevent Sovereign from moving forward therein while the Debtors pursue relief from the Order, seek to have the Settlement Agreement modified and/or rescinded, and subsequently move to modify their Plan.

Upon consideration and for the reasons stated below, the Motion shall be denied. Neither the facts nor the law support a ruling in the Debtors' favor.

---

[1] Fed. R. Civ. P. 60 is applicable to bankruptcy cases pursuant to Fed. R. Bankr. P. 9024.

2

## BACKGROUND

### The Remediation Loan

In January of 2007, the Debtors executed a loan agreement (the "Remediation Loan") with Sovereign to borrow up to $23 million. Motion ¶ 7. The purpose of the loan was to finance the "payment of clean-up costs associated with the environmental remediation of" the proposed site of "Whiteland Village," a 100 acre, continuing care retirement community (the "Project"), which the Debtors planned to develop. Joint Exhibit 3;[2] Motion ¶¶ 6-7; Response of Sovereign Bank in Opposition to Debtors' Motion to Reopen Cases and Reimpose the Automatic Stay in Connection with Foreclosure Action ("Response") at 3; Settlement Agreement at 1.[3] According to the Remediation Loan, the $23 million loan would mature on January 16, 2008. Response at 3. As security for the loan, the Debtors executed a mortgage and security agreement in favor of Sovereign, granting it a lien in the amount of $23 million on the proposed site of the Project as well as on another piece of property (collectively the "Property"). Motion ¶ 8; Settlement Agreement at 1. As additional security for the loan, the Guarantors,

---

[2] The Debtors and Sovereign stipulated to 42 Joint Exhibits which the Court admitted into evidence. Hearing Transcript, dated 2/19/13 ("HT 2/19/13"), at 26-27. Id.

[3] The Settlement Agreement is attached as Exhibit A to the Order Granting Motion to Approve Settlement Agreement Between Debtors, Frazer/Exton Development, L.P. and Whiteland Village, Ltd., and Sovereign Bank Pursuant to Fed. R. Bankr. P. 9019. See Docket Entry No. 169.

namely Robert G. Roskamp, Paul Woodruff, Phil Kaltenbacher, Roskamp
Management Company, LLC, and KRW Pennsylvania, L.P., each of whom is a
direct or indirect owner or affiliate of Frazer, entered into guaranty agreements
("Guaranty Agreements") with Sovereign.  Motion ¶ 9.

In June of 2007, Sovereign and HSH Nordbank AG ("Nordbank") issued a
term sheet ("Term Sheet") for a loan of $181.5 million to finance the construction
of 393 independent living units at Whiteland Village.  Joint Exhibit 5; Motion ¶ 11.
After execution of the Term Sheet, the Debtors proceeded with environmental
remediation of the proposed site for Whiteland Village.  Motion ¶¶ 12-13.  They
also engaged in marketing efforts for Whilteland Village.  Id.  However, in March
of 2008, the Debtors were informed that Sovereign and Nordbank had decided
not to make the $181.5 million construction loan.  Motion ¶ 15. Moreover, the
Debtors were advised that Nordbank was exiting entirely from the project.  Id.
Sovereign subsequently offered to consider providing a $125 million construction
loan to the Debtors but that amount was insufficient to meet the Debtors' needs.
Motion ¶ 16.

On June 20, 2008, the Debtors and Sovereign entered into an amendment
to the Remediation Loan, increasing the amount of the loan by an additional
$6 million for a total amount of $29 million and extending the maturity date of the
loan to October 15, 2008.  Motion ¶¶ 17-18.  The Debtors executed an additional

mortgage and security agreement in favor of Sovereign, granting the bank another mortgage lien on the Property in the amount of $6 million. Motion ¶ 17.

In December of 2008, the Debtors and Sovereign entered into a second amendment to the Remediation Loan pursuant to which the maturity date of the loan was extended to April 15, 2009. Motion ¶ 19. On April 30, 2009, Sovereign issued a default letter to the Debtors based on their failure to repay the Loan by its maturity date. Settlement Agreement at 3. On August 12, 2009, the Debtors, the Guarantors and Sovereign negotiated a 60 day forbearance agreement in exchange for a payment of $615,000. Motion ¶ 22.

### The State Court Actions

On October 10, 2010, Sovereign commenced the Foreclosure Action against the Debtors in state court. Motion ¶ 23. Sovereign also filed a civil action in state court against the Guarantors ("Guaranty Action"). Motion ¶ 24. In the Foreclosure Action, the Debtors filed a $200 million lender liability counterclaim against Sovereign but the counterclaim was dismissed without prejudice by the state court on a procedural ground. HT 2/19/13 at 92-93.

### The Debtors' Bankruptcy Cases

On May 19, 2011, the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Motion ¶ 25. As of the aforementioned date, the Debtors' underlying obligation to Sovereign "was approximately $34,000,000." Docket Entry No. 157 ¶ 16. Upon request of the Debtors, the

5

Court ordered that their bankruptcy cases would be jointly administered. Docket Entry No. 87.

On June 14, 2011, Sovereign filed a motion for relief from the automatic stay ("Motion for Relief"), which it subsequently amended, to exercise its rights with regard to the Property. Docket Entry Nos. 51 & 119. The Debtors promptly commenced discovery regarding the Motion for Relief and its defenses thereto, and filed responses in opposition to the original and amended Motions for Relief. See Joint Exhibits 37-40; HT 2/19/13 at 76-77; Docket Entry No. 66 & 132. The Debtors' responses focused on: (i) whether the amount which the Debtors owed to Sovereign was in dispute since the Debtors intended to re-file their $200 million lender liability claim against Sovereign in another venue; (ii) whether Sovereign had evidence regarding the value of the Property; (iii) whether Sovereign could satisfy the burden of proving that there was no equity in the Property; (iv) whether the Debtors had a viable reorganization in progress; and (v) whether Sovereign was adequately protected. See Docket Entry Nos. 66 & 132.

Notably, the Debtors did not assert a lender liability counterclaim in response to Sovereign's original or amended Motions for Relief,[4] id., and they did

---

[4] The Debtor's original bankruptcy counsel, Albert Ciardi, III, testified that the Debtors "raised" their lender liability claim as a defense in their response to Sovereign's Motion for Relief. HT 2/19/13 at 93. While the Debtors *referred* to the lender liability counterclaim to deny Sovereign's allegation in its Motion for Relief regarding the amount which the Debtors owed it, they did not assert a lender liability claim against Sovereign as a defense or counterclaim to the Motion for Relief.

not file an adversary proceeding against Sovereign raising such a claim.  HT

2/19/13 at 93.

As part of their discovery in opposition to and defense of Sovereign's

Motion for Relief, the Debtors served four notices of deposition.  Two of the

notices of deposition, dated June 21, 2011, were directed to Sovereign

employees, Timothy Caron and Victoria Woodward.[5]  See Joint Hearing Exhibits

39 & 40.  Caron was a member of Sovereign's workout group.  He was

responsible for managing the bank's credit relationship with the Debtors and

generally responsible for coordinating the workout of the bank's loan to the

Debtors.  HT 2/19/13 at 31, 58.  Prior to Caron, Woodward managed Sovereign's

relationship with the Debtors.  See Joint Exhibit 11 at p. 18; HT 2/19/13 at 58, 66.

Both Notices of Deposition (to Caron and Woodward) contained a Request

for Production of Documents attached thereto as Exhibit "A."  See Joint Hearing

Exhibits 39 & 40.  The Requests for Production of Documents were identical.

The requests demanded production of the following documents:

> 1.    Any and all documents comprising and/or relating
>       to the Debtors' loan(s) with Sovereign Bank.
>
> 2.    Any and all documents relating to administrations
>       of the Debtor's loan(s) file with the Sovereign
>       Bank.

---

[5] The other two notices of deposition were served on a former employee of
Nordbank and a former Sovereign employee.  Joint Exhibit Nos. 37 & 38.  While
the Debtors took the depositions of Caron and Woodward, they elected not to
take the other two depositions.  HT 2/19/13 at 94.

3.    Any and all documents the Sovereign Bank
provided to any third party regarding the
Debtors' loan(s).

4.    Any and all appraisals of the Debtors' property
located on about 100 acres in Chester County,
Pennsylvania on property owned by Frazier/Exton
Development, where Whiteland Village was
proposed (the "Property") completed by the
Sovereign Bank or completed on their behalf.

5.    Any and all underwriting documents relating to the
Debtors' loan(s) with the Sovereign Bank.

6.    Any and all analysis or valuations of the Debtors'
loan(s) with the Sovereign Bank or completed by
the Sovereign Bank or completed on their behalf.

7.    Any and all analysis or valuations of the Debtors'
property located at the Property completed by the
Sovereign Bank or completed on their behalf.

8.    All documents relating to the relationship between
HSH Nordbank and Sovereign Bank relating to
the Debtors['] loan or the Property.

Joint Hearing Exhibits 39 & 40.  Since the documents being requested were

corporate records, Sovereign agreed to treat the request for production of

documents ("Request for Documents") as a request made to Sovereign pursuant

to Fed. R. Civ. P. 34.[6]  HT 2/19/13 at 58; Joint Exhibit 41 at p. 2, ¶ 1.

On August 11, 2011, Sovereign served its responses and objections to the

Debtors' Request for Documents. Joint Hearing Exhibit 7.  Sovereign

subsequently supplied a privilege log and produced approximately 14,000 pages

---

[6] Fed. R. Civ. P. 34 is applicable to contested matters pursuant to Fed. R.
Bankr. P. 7034 and Fed. R. Bankr. P. 9014(c).

of documents to the Debtors.  HT 2/19/13 at 58-59.  However, as noted above

and as will be discussed in more detail below, in responding to the Request for

Documents, Sovereign only searched one of three sources of electronically

stored information.  HT 2/19/13 at 53.  The two sources which Sovereign failed to

search were its: (i) shared drives; and (ii) backup tapes.  Id.  The backup tapes

contain Sovereign's electronically stored information pre-dating February 28,

2008.[7]  HT 2/19/13 at 52.

    According to Debtors' original bankruptcy counsel, Mr. Ciardi, the Debtors

raised several specific issues with Sovereign with respect to its document

production.  However, Mr. Ciardi testified that the Debtors either resolved the

issues with Sovereign or simply dealt with them.[8]  HT 2/19/13 at 100-102.  None

of the issues which the Debtors raised concerned the dearth of documents pre-

dating February 28, 2008.  When asked why the Debtors did not raise this issue

---

[7] The backup tapes may contain all electronically stored information pre-dating February 28, 2008 or they may contain only emails prior to that date. HT 2/19/13 at 38.  Sovereign's employee, Mr. Caron, was unsure about this point.

[8] According to Mr. Ciardi, the Debtors had an issue with Sovereign's privilege log because the Debtors believed that it contained documents that were not privileged.  Sovereign agreed to produce the requested documents so the issue was resolved.  Id. at 101.  The Debtors also had an issue with regard to the lack of documents relating to Sovereign's appraiser.  Id.  Again, Sovereign agreed to produce the requested documents so the issue was resolved.  Id.  The Debtors also complained regarding the manner in which Sovereign produced its documents because they could not be "easily searched or reviewed."  Id.  However, the Debtors concluded that this "was an issue that really didn't lend itself to being resolved" so they "simply dealt with it, reviewed the documents, and got the information that [they] needed."  Id.

with Sovereign, Mr. Ciardi testified that while the Debtors had "noticed that the

documents produced for that time period were sparse," the Debtors had some

documents for the period and Mr. Caron had testified when he was deposed on

September 8, 2011, that Sovereign "had searched their entire electronic

database, and this is what they had." HT 2/19/13 at 96.  Based on the Court's

review of Mr. Caron's deposition, particularly the pages which the Debtors cite to

support Mr. Ciardi's testimony, Mr. Caron never made such a statement

regarding Sovereign's document production.[9]

---

[9] Mr. Ciardi conducted Mr. Caron's 2011 deposition.  Based on the Court's
review of the deposition, Mr. Caron was never asked whether Sovereign
searched all of its electronic databases in responding to the Debtors' discovery
requests.  He was also never questioned about the sparsity of documents which
Sovereign produced pre-dating February 28, 2008.  Consequently, there is no
testimony from Mr. Caron on either of these two matters.

During his deposition, Mr. Caron mentioned that Sovereign had a "central
directory."  Joint Exhibit 11 at 33.  He also mentioned that certain files at
Sovereign may have been stored on a "personal drive" that is part of Sovereign's
"Microsoft outlook interface."  Id. at 34.  When asked by Mr. Ciardi whether a
"substantive" email would be located on a personal drive or on the central
directory, Mr. Caron testified: "It's both.  Again, it may reside in the Outlook email
system only; it may reside in the personal folder within that Outlook email system
or it may reside in the central network directory for the bank."  Id. at 36-37.  Later
during the deposition, Mr. Ciardi confirmed with Mr. Caron that, "at some point
within the last 30, 60 days," he had become aware that the Debtors "had
requested certain discovery and documentation from Sovereign."  Id. at 49.
Mr. Ciardi then asked Mr. Caron to identify the individuals at Sovereign who
generated the documents on Sovereign's behalf that were delivered to its counsel
in conjunction with the Debtors' document requests.  Id. 49-50.  Mr. Caron
testified that it would have been a combination of individuals, including himself
and an in-house paralegal.  Id.  He specifically stated that the paralegal would
have been responsible for coordinating Sovereign's electronic discovery.  Id.
Mr. Caron also mentioned that certain names and "related references" would

(continued...)

On September 15, 2011, which was only a week after Mr. Ciardi deposed

Mr. Caron, Sovereign, the Debtors and the Guarantors reached a "settlement in

principle" with regard to Sovereign's Motion for Relief.  Hearing Transcript, dated

September 15, 2011 ("HT 9/15/11"), at 7.  On the same day, the parties stated

the terms of the "settlement in principle" on the record before the Court.  See

Docket Entry No. 141.  Sovereign's counsel outlined the basic terms of the

"settlement in principle," stating as follows:

> This is a $21.5 million settlement with Sovereign Bank.
> And it is being paid basically $1.5 million within 30 days.
> He [referring to Mr. Ciardi] was correct that there are six
> $50,000 payments.  If they don't all get paid by the time
> Makamie closes, whatever hasn't been paid will be
> added to the [$]15.5 million to be paid to Sovereign at
> the closing.
>
> The balance of the [$]4.2 million, the only thing he left
> out on that [referring again to Mr. Ciardi] was that if the
> Whiteland tract sells for more than [$]4.2 million, the
> bank would get [$]4.2 – the greater of [$]4.2 million, or
> the net proceeds after the customary and reasonable
> settlement costs.

HT 9/15/11 at 8.  To facilitate the "settlement in principle," the Debtors agreed to

the entry of a consensual order granting Sovereign conditional relief from the

---

[9](...continued)
have been given to the paralegal to use in conducting her search of Sovereign's
electronic discovery.  Id. at 51-52.  He further testified that Sovereign would have
provided its information and documents to its outside counsel who would have
made the decision of which documents to produce or not produce to the Debtors.
Id. at 51.  None of this testimony supports Mr. Ciardi's recollection that Mr. Caron
testified that Sovereign had given them all electronically stored information in its
possession that was responsive to the Debtors' document requests.

automatic stay which allowed Sovereign to pursue its right in the Property upon the occurrence of certain specified events.  The agreement between the parties was "expressly conditioned" upon Sovereign approving and executing a *written* settlement agreement containing the material terms of the parties' "settlement in principle."  Id.  At the conclusion of the hearing, the Court specifically asked the Debtor's counsel what, if anything, the settlement was going to do for unsecured creditors.  Mr. Ciardi responded:

> Well, what it will allow us to do, Your Honor, is we'll have to modify the plan, obviously, because the plan — I mean the sale will still need to go forward.  We're still intending to go forward with all of that.
>
> And once that's in place – the plan, as of right now, does deal with the payment to unsecured creditors.  And we're hoping that now with the resolution of Sovereign Bank, the reduction of legal fees, we're going to be able to pay unsecured creditors, I think most, if not all, of their money.  And that's going to tie into our litigation eventually with Citizens Bank because they are – well, I'll address that at that point in time, Your Honor.
>
> But I think we will then be able to revise the plan to reflect that, and I think this ends up actually being a tremendous benefit to the unsecureds.

HT 9/15/11 at 9.

### The Written Settlement Agreement and Confirmation of the Plan

On November 16, 2011, Sovereign, the Debtors and the Guarantors entered into the Settlement Agreement providing for the sale of a portion of the Property to Makemie at Whiteland ("Makemie").  The terms of the Settlement

12

Agreement required the sale to Makemie ("Makamie Transaction") to close by June 30, 2012. Docket Entry No. 169, Exhibit A at 4. However, the Settlement Agreement included an extension option ("Extension Option") in case the Makamie Transaction failed to close by the required date. Settlement Agreement ¶ 10. The Extension Option, if triggered by the Debtors' compliance with certain requirements, obligated Sovereign to forbear from enforcing a judgment in the Foreclosure Action until 5:00 p.m. on September 30, 2012. Id.

The Settlement Agreement also obligated Sovereign to forbear exercising its rights against the Property absent the occurrence of an "event of default." Id. ¶ 3. While the Settlement Agreement identifies numerous "events of default," only one of them is relevant here. It is contained in paragraph 15.8 which provides:

> [If] The Makemie Transaction fails to close by June 30, 2012 and Guarantors and Borrowers have not provided or are not entitled to provide notice exercising the Extension Option[, an Event of Default exists hereunder].

Settlement Agreement ¶ 15.8.

In the Settlement Agreement, the Debtors and the Guarantors provided a release ("Release") to Sovereign "from and against all claims, counterclaims, demands, damages, . . . proceedings, actions and rights or causes of action, or suits or proceedings of any kind or nature . . . whether accrued or unaccrued, matured or unmatured . . . arising out of or relating to" the Remediation Loan, the

13

Foreclosure Action, the Guaranty Action and/or the Debtors' bankruptcy cases.

Settlement Agreement ¶ 23.  Sovereign is using the Release to prevent the

Debtors and Guarantors from raising defenses against it in the Foreclosure and

Guaranty Actions.  In addition, the Release presents a likely insurmountable

obstacle to the Debtors' attempt to litigate a lender liability claim against

Sovereign.  Thus, the filing of the Debtors' Motion was motivated, in part, by the

Debtors' and Guarantor's desire or need to prevent Sovereign from using the

Release against them.  See Motion ¶¶ 46 & 66 (Debtors' assertion that they seek

to reopen their bankruptcy cases to obtain relief from the Order and Settlement

Agreement and to modify the Plan "to eliminate any release of Sovereign and

allow the Debtors "to pursue litigation directly against Sovereign.").

   In their motion to approve the Settlement Agreement, the Debtors alleged

that the settlement was in the best interest of the estate and its creditors, stating

as follows:

> 21.  [T]he Debtor believes that the Agreement is
> in the best interests of the estate and its creditors, and is
> fair and equitable.  The Agreement results in a discount
> of approximately $12,500,000, related to the aggregate
> debt attributable to the Bank of approximately
> $34,000,000, for the benefit of the estate which may not
> have been otherwise available outside of costly
> litigation.

> 22.  In addition, the settlement allows the Debtor
> to avoid the costs and delay of *pursuing discovery* and
> litigation with the Bank, as well as the uncertainty of the
> outcome of such litigation.

14

> 23.  Finally, resolution of the litigation between the Debtor and the Bank will allow the Debtor to focus on closing the proposed sale to Makemie, confirming a Plan of Reorganization that will allow for a meaningful distribution to creditors, and emerging from bankruptcy.

Docket Entry No. 157 ¶¶ 21-23 (emphasis added).  Importantly, in paragraph 22, the Debtors acknowledged that they had not finished "pursuing discovery" against Sovereign when they entered into the Settlement Agreement.

On November 17, 2011, the Court approved the Settlement Agreement. Docket Entry No. 169.  On February 2, 2012, the Court subsequently confirmed the Debtors' Second Amended Plan of Reorganization (the "Plan") which provided that Sovereign's secured claim would be treated in accordance with the terms of the Settlement Agreement.  Docket Entry Nos. 183 & 199.  In May 2012, the Court entered the Final Decree closing the Debtors' bankruptcy case.  Docket Entry No. 213.

### Post-Confirmation Events

"Due to circumstances beyond the Debtors' control," the Makemie Transaction did not close on or before June 30, 2012.  Motion ¶ 36.  The Debtors were subsequently unable to make the payments required by the Settlement Agreement which prevented them from exercising the Extension Option.  Motion ¶ 37. Sovereign promptly proceeded with the Foreclosure and Guaranty Actions as allowed by the Settlement Agreement and the Plan.  Motion ¶¶ 36-37.

On July 22, 2012, my colleague, the Honorable Stephen Raslavich, issued a decision regarding Sovereign in an adversary proceeding in an unrelated bankruptcy case. See 400 Walnut Associates, L.P. v. 4th Walnut Associates, L.P. (In re 400 Walnut Associates), 475 B.R. 217 (Bankr. E.D. Pa. 2012). In the decision, Judge Raslavich concluded that Sovereign engaged in an "egregious abuse of the discovery rules" in failing to fully comply with two subpoenas *duces tecum* which were served upon it by the debtor. 475 B.R. at 231. Describing the import of Sovereign's misconduct, Judge Raslavich stated: "Sovereign's misconduct in this matter constitutes one of the most serious incidents of discovery abuse the Court has witnessed." Id. at 218.

Steven Coren, Esquire, was one of the attorneys who represented the debtor in the adversary proceeding before Judge Raslavich. See Bankruptcy Case No. 10-16094, Docket Entry Nos. 347 & 360; see also Motion ¶ 39 n.1. On August 16, 2012, Mr. Coren was retained by the Guarantors to provide a defense in the Guaranty and Foreclosure Actions. Joint Exhibit 13 ¶¶ 36, 38; HT 1/29/13 at 12.

On August 21, 2012, the Guarantors filed a motion to extend ("Motion to Extend") in the Guaranty Action seeking a six month extension of the scheduling

deadlines to enable them to conduct discovery.  Joint Exhibit 13 ¶ 1.  The first

paragraph of the Motion to Extend states:

> 1.      Plaintiff Sovereign Bank ("Sovereign") seeks to recover
> more than $33,000,000 from Defendants in litigation
> where no discovery has yet taken place.  The parties
> have not exchanged any documents, or taken any
> depositions.  To the extent the parties engaged in
> abbreviated discovery during their detour into a
> bankruptcy proceeding, Defendants – through their
> newly retained counsel, now question whether
> Sovereign withheld critical documents that had been
> requested in discovery during that bankruptcy
> proceeding.

Joint Exhibit 13 ¶ 1.  In footnote 2 of the Motion to Extend, the Guarantors

specifically identified the gaps which existed in Sovereign's document

production in the Debtors' bankruptcy cases:

> It is now apparent that Sovereign's document production
> in the Whiteland Village Bankruptcy Proceeding was
> woefully incomplete.  For example, the production is
> essentially devoid of: (1) correspondence between
> Sovereign and Nordbank from the time of Nordbank's
> first involvement thru its exit in March 2008; and,
> (2) correspondence and other internal Sovereign
> documents for most of the calendar year 2007, an
> ominous sign given that the Remediation Loan closed
> on January 16, 2007, and discussions surrounding the
> follow-up $181.5 million construction financing were
> ongoing thereafter.

Joint Exhibit 13  ¶ 31 n.2.  In footnote 3, the Guarantors made the following

representation: "The Borrowers and Defendants are contemplating, among other

actions, the reopening of the Whiteland Village Bankruptcy Proceeding – in an

effort to vacate or amend the Confirmed Plan – and the commencement of

17

litigation to vacate, rescind or void the Settlement Agreement." Joint Exhibit 13 ¶ 33 n.3.

According to Mr. Coren, the Guarantors' Motion to Extend was granted. HT 1/29/13 at 12. The parties subsequently agreed to "put all of the State Court litigation on hold" while they conducted substantive settlement discussions.[10] Id. The parties (Sovereign being one of the parties) signed a stipulation to that effect and the stipulation was apparently filed in both the Foreclosure and the Guaranty Actions. Id. at 11-12. In mid-October, Sovereign concluded that the settlement negotiations were not fruitful. Id. at 13. At that point, counsel requested a conference with the state court. Id. At the conference, which was held on November 19, 2012, the Debtors advised the state court that they were going to file a motion seeking to have their bankruptcy cases reopened. Id. at 13, 19.

More than two months later, on January 22, 2013, the Debtors filed the Motion currently before this Court, seeking to have their bankruptcy cases reopened and to have the automatic stay reimposed. As noted above, the Debtors allege that the Settlement Agreement and resulting Plan were the product of discovery misconduct and "likely, fraud" by Sovereign. Motion ¶ 2. The Debtors assert that it is highly likely that "numerous directly relevant and perhaps even smoking-gun type documents were not produced by Sovereign." Docket Entry No. 218, ¶ 39. In support of their allegations of discovery

---

[10] That is, once again, the Debtors were willing to settle with Sovereign without complete discovery, when they knew discovery was incomplete.

18

misconduct or fraud against Sovereign, the Debtors cite Judge Raslavich's decision sanctioning Sovereign in 400 Walnut Associates, L.P., supra.

On January 28, 2013, Sovereign filed its response ("Response") to the Debtors' Motion, arguing that the Motion is yet another tactic by the Debtors to "delay Sovereign's ability to gain relief against Debtors and their guarantors on a $29 million loan that has been in default for nearly four years." Response at 1. As for the Debtors' contention that Sovereign's document production in their bankruptcy cases was inadequate and incomplete, Sovereign admits in its Response that it did not produce emails generated prior to February 28, 2008 because they "only exist on backup tape" and that it made the decision with its counsel not to search or review the backup tapes in responding to the Debtors' document requests. Response at 17 n.4. While Sovereign's counsel "acknowledges that it could have better articulated this objection" in responding to the Debtors' document requests,[11] Sovereign asserts that "nothing prevented the

---

[11] In its response to the Debtors' document requests, the only objection which Sovereign made regarding electronically stored information was a boilerplate type of objection which Sovereign included under the section labeled "General Objections." The objection states:

> Sovereign objects to each Document Request propounded by Debtors to the extent that ... it seeks disclosure of electronically stored information from sources that are not reasonably accessible because of undue burden or cost[.]

Joint Exhibit ¶ 2(i). Obviously, this objection was not tailored in any way to alert the Debtors to the fact that Sovereign was refusing to search emails and

(continued...)

Debtor's counsel" from pressing the issue at the time.   Id.

On January 29, 2013, the Court held its first hearing regarding the Motion. The sole issue before the Court was whether to grant the Debtors' request for an expedited hearing on the Motion.  After counsel presented oral argument on the issue, the Court denied the Debtors' motion and scheduled an evidentiary hearing on the Motion on February 19, 2013.  HT 1/29/13 at 29-30.  Upon request, the parties were advised that they could move forward and conduct pre-hearing discovery.  Id. at 29.

At the hearing on February 19th, Sovereign's workout officer, Mr. Caron, testified *via* videotape that Sovereign had not searched two of three available sources of potentially responsive, electronically stored information in responding, during the Debtors' bankruptcy cases, to their Request for Documents. Again, the two sources that were not searched are: (i) the backup tapes on which information and emails pre-dating February 28, 2008 are stored; and (ii) the shared drives.  HT 2/19/13 at 36-38, 52.  Mr. Caron testified that Dilworth made the decision not to have the backup tapes restored and searched.[12]  Insofar as

---

[11](...continued)
information pre-dating February 28, 2008.  Sovereign's counsel's "acknowledgment that it could have better articulated this objection" is an extreme understatement.

[12]  Mr. Caron testified that he discussed the existence of the backup tapes with Dilworth.  HT 2/19/13 at 40.  Mr. Caron also admitted, that as of February 19, 2013, it was his understanding that the backup tapes still had not been restored or searched.  Id. at 46.

the shared drives, Mr. Caron testified that he had learned, a few months before

the Debtors filed their Motion, that the shared drives had not been searched by

Sovereign due to a mis-communication or misunderstanding between

Sovereign's in-house paralegal, Judith Bardsley, and Dilworth. Id. at 44.  In the

Guaranty Action, the shared drives were searched by Sovereign and, as of

2/19/13, 36,000 pages had been produced in that action with approximately

100,000 or so more pages that still needed to be reviewed by Sovereign to

determine whether they needed to be produced. Id. at 46.  In comparison,

Sovereign produced only 14,000 pages of documents in the Debtors' bankruptcy

cases. Id. at 45.

Matthew Faranda-Diedrich, Esquire, an associate (the "Associate") at

Dilworth, also testified via videotape at the February 19th hearing.  According to

the Associate, he was primarily responsible for: (i) working with Sovereign's in-

house paralegal to determine the sources of electronically stored information

which existed at Sovereign; (ii) preparing Sovereign's response and objections to

the Debtors' document requests in their bankruptcy cases; (iii) identifying

privileged documents which would be withheld from production to the Debtors;

and (iv) preparing the privilege log which was given to the Debtors. Id. at 57, 60-

61. See also id. at 34.  He testified that, in his discussions with Sovereign's

paralegal, he recalls only two sources of electronically stored information being

identified, namely the backup tapes and the emails which Sovereign maintains on

21

its current system. Id. at 60-61, 68-69. He does not recall the shared drives ever being mentioned but does not recall whether he ever asked Sovereign's paralegal about them. Id. at 68-69. He "just remember[s] being focused on the emails." Id. at 69. Insofar as the backup tapes, he testified that Sovereign's paralegal advised him that Sovereign maintains electronically stored information pre-dating February of 2008 on backup tapes but that it would be burdensome and costly to restore and search the tapes.[13] Id. at 61. Based on this information, Dilworth made the decision that the backup tapes would not be restored and searched.[14] Id. at 61.

The Associate testified that it had been his intention to include a specific objection to producing information on the backup tapes in response to each of the Debtor's document requests that implicated electronically stored information. HT 2/19/13 at 68. His testimony in this regard is supported by an email which he drafted on July 5, 2011, setting forth a discovery action list ("Discovery Action

_____

[13] There is no evidence in the record regarding the cost of restoring the backup tapes.

[14] Sovereign's searching and production of documents from its "back-up tapes" was also an issue in Judge Raslavich's adversary proceeding. See 400 Walnut Associates, L.P. v. 4th Walnut Associates, L.P. (In re 400 Walnut Associates, L.P.), 475 B.R. 217, 226 (Bankr. E.D. Pa. 2012).

List") based on a meeting that took place that day at Dilworth. Id. at 62-63; Joint

Exhibit 12.  The list states, in pertinent part:

> 5) Draft responses to debtors' document requests to
> Caron/Woodward
>
> - including objection that just giving email from February
> 2008 forward (rest are on costly back-up tapes) and that
> searching other databases/date ranges is overly costly
> and burdensome.)

Joint Exhibit 12.  The Associate sent the email containing the Discovery Action

List to a Dilworth partner who responded stating that the list "looks good to me."

HT 2/19/13 at 62-63; Joint Exhibit 12.

Despite Dilworth's intention, Sovereign's response to the Debtors' Request

for Documents contains no objection or information alerting the Debtors to the

existence of the backup tapes and stating that they were not being restored and

searched. Id.  at 62-63.  Consequently, prior to entering into the Settlement

Agreement, the Debtors were unaware of: (i) Sovereign's decision not to restore,

search and produce relevant documents on its backup tapes; (ii) that the backup

tapes contained electronically stored information pre-dating February 28, 2008;

and (iii) Sovereign's failure to search its shared drives for relevant documents.[15]

---

[15] The Court observes that, except for noting the absence of
correspondence between Nordbank and Sovereign in March of 2008, the
Debtors' counsel may have legitimately had no reason for doubting that he had
been given all relevant, non-privileged documents by Sovereign from on or after
March 1, 2008.  Nevertheless, for the reasons set forth in the Court's
"Discussion," *infra*, the Debtors' Motion shall be denied because it would be an
exercise in futility to grant it.

When Mr. Ciardi testified at the February 19th hearing, he explained that, while he was representing the Debtors in their bankruptcy cases, he was working with three principals. Two of the principals were inclined to settle but the third principal, Mr. Kaltenbacher, wanted to "go to war" with Sovereign, HT 2/19/13 at 80, meaning that he wanted the Debtors to litigate their lender liability claims against Sovereign. Id. at 80-81. Mr. Ciardi was specifically asked "how the information produced by Sovereign weighed in [his] decision to counsel the Debtors as to whether or not to enter into a settlement agreement, or to go to war?" Id. at 82. Mr Ciardi answered as follows:

> The information that we had at the time that we reached the [S]ettlement [A]greement, did not indicate to us in any fashion that the two things we were looking at in the counterclaim, one was the Nordbank/Sovereign relationship before Nordbank pulled out. We really didn't have anything solid to tie Sovereign into that. And we, as part of the settlement, we were carving out Nordbank so we could sue them at some point in time later.
>
> But we didn't have anything to tie Sovereign. And we didn't have, or at least I - - I did not see anything, nothing was provided to us that would at least give me anything to advocate Mr. Kaltenbacher's position that Sovereign was acting in bad faith after Nordbank pulled out.
>
> We didn't have any documentation that showed that they were either misleading us or doing anything that was improper. We didn't have paperwork, or anything that would help us in our counterclaim, so that that [sic] balanced in favor of doing the settlement.

24

Id. at 82.  On cross-examination by Sovereign's counsel, Mr. Ciardi was asked

whether one of the primary reasons that the Debtors entered into the Settlement

Agreement was to avoid the costs and delays of pursuing discovery and litigation

against Sovereign.  He answered the question as follows:

> That was one of the reasons.  There was also the
> reason that we were able to go forward with our sale,
> and that we had received a discount.  And that we had
> looked at all of the Sovereign documents and
> determined that the release that we were giving
> Sovereign wasn't really impacting any of our rights.  So
> we had analyzed the counterclaim value, the sale, a lot
> of things went into that analysis.

Id. at 95.

At the close of the hearing on February 19th, the parties were each directed

to file a short memorandum on the issue of equitable tolling with regard to the one

year time limitation set forth in Fed. R. Civ. P. 60(b)(3).  The parties complied with

the Court's directive.

At the next hearing on the Motion on March 20th, the parties presented oral

argument on the application of equitable tolling, based on the facts of the instant

case, to the one year time limitation set forth in Rule 60(c)(1) for motions made

under Rule 60(b)(1)-(3). The Court concluded that the Debtors had failed to

exercise due diligence and, consequently, that equitable tolling would not apply.

After issuing the  aforementioned ruling, the Court directed the Debtors to file a

statement explaining the contours of the Rule 60(d)(1) action which they would

file against Sovereign if their bankruptcy cases were reopened.  Sovereign was

told to file a response to the statement and the Debtors were given the

opportunity to file a reply.  Shortly thereafter, the Debtors filed a motion for leave

to file a supplemental memorandum concerning the mechanics of applying the

doctrine of equitable tolling ("Motion for Leave").  Docket Entry No. 252.

At the next hearing on the Motion on May 21, 2013, the Court orally

granted the Debtors' Motion for Leave.  Hearing Transcript, dated May 21, 2013

("HT 5/21/13") at 4.  With regard to the Debtors' assertion of an independent

action under Rule 60(d)(1), the Court directed the Debtors' counsel to provide an

offer of proof regarding the grave miscarriage of justice that would occur unless

the Debtors were permitted to file such an action against Sovereign.  In response,

the Debtors' counsel, Mr. Coren, stated as follows:

> Your Honor, the grave injustice here is to perpetuate in
> our judgment a fraud oath on the debtors and a court in
> connection with the bankruptcy proceeding as well as in
> that context the creditors as well by withholding material
> information which was being considered and which was
> important in the context of proposing and confirming a
> plan of reorganization which of course has to be
> presented to creditors and the Court, and to do so by
> intentionally concealing the withholding of the material
> documents and to never come clean on that, to mislead
> the debtor through its counsel that Sovereign had in fact
> complied with its discovery obligations when it had to
> know that that was false.

> All of that led to the confirming of a plan that would not
> have otherwise been confirmed, the granting of releases
> that would not have been granted and substantial
> prejudice to the debtors and to the creditors, not to
> mention the integrity of the bankruptcy system.
>
> I would submit to this Court that full disclosure is a
> hallmark of the bankruptcy system, and everybody
> knows that when one is considering a plan and
> proposing it to a court and to creditors that full
> disclosure and honesty is critically important.  That
> was sacrificed here.

HT 5/21/13 at 5-6.  The Court thereupon took the matter under advisement,

informing the parties that, absent the need for further oral argument, a decision

on all facets of the Motion would be issued.

## DISCUSSION

The Bankruptcy Code provides that "[a] case may be reopened in the court

in which such case was closed to administer assets, to accord relief to the debtor,

or for other cause." 11 U.S.C. § 350(b). The burden of "demonstrating

circumstances sufficient to warrant reopening a case is on the moving party." In

Re Redcay, 2007 WL 4270378, at *2 (Bankr. E.D. Pa. Dec. 3, 2007). The

decision whether to reopen a case is within a bankruptcy court's broad discretion.

In re Lazy Days' RV Center, Inc., ___ F.3d ___, 2013 WL 3886735, at *3 (3rd Cir.

July 30, 2013).  Factors which courts consider in determining the propriety of

reopening a bankruptcy case include the following:

> (1)   the length of time that the case was closed;
>
> (2)   whether a non-bankruptcy forum, such as state
>        court, has the ability to determine the issue
>        sought to be posed by the debtor;
>
> (3)   whether prior litigation in bankruptcy court
>        implicitly determined that the state court would be
>        the appropriate forum to determine the parties'
>        rights, post-bankruptcy;
>
> (4)   whether any parties would be prejudiced if the
>        case were/were not reopened;
>
> (5)   the extent of the benefit which the debtor seeks to
>        achieve by reopening; and
>
> (6)   whether it is clear at the outset that the debtor
>        would not be entitled to any relief after the case
>        was reopened.

In re Janssen, 396 B.R. 624, 634-35 (Bankr. E.D. Pa. 2008), In re Padilla, 365

B.R. 492, 503 (Bankr. E.D. Pa. 2007).   In the instant matter, the focus is on

factor number 6.

        Importantly, the reopening of a bankruptcy case is a ministerial act that has

no substantive effect in and of itself, The First National Bank of Jeffersonville v.

Goetz (In re Goetz), 2009 WL 1148580, at *2 (Bankr. S.D. Tex. April 29, 2009),

but it does provide the moving party with the opportunity to seek substantive

relief.  Horizon Aviation of Virginia, Inc. v. Alexander, 296 B.R. 380, 382 (E.D. Va.

2003).   If the moving party cannot obtain the substantive relief which it intends to seek, "then there is no reason to grant a motion to reopen."  In re Goetz, 2009 WL 1148580 at * 2.  In other words, "a closed bankruptcy proceeding should not be reopened 'where it appears that to do so would be futile and a waste of judicial resources.'" Redmond v. Fifth Third Bank, 624 F.3d 793, 803  (7th Cir. 2010) (quoting In re Carberry, 186 B.R. 401, 402 (Bankr. E.D. Va. 1995)).  See also In re Fellheimer, 443 B.R. 355 (Bankr. E.D. Pa. 2010) (bankruptcy court denied motion to reopen bankruptcy case on the ground that no valid purpose would be served by reopening the case); In re Janssen, 396 B.R. 624, 634 n.13 (Bankr. E.D. Pa. 2008) (noting that if, as a matter of law, the debtor is not entitled to the relief which it requests, "reopening the bankruptcy case would be a futile action, making it appropriate to deny a motion to reopen the case."); In re Redcay, 2007 WL 4270378, at *2 (Bankr. E.D. Pa. Dec. 3, 2007) (observing that "a case will not be reopened if reopening would be futile, i.e., the court cannot provide the moving party with the underlying relief requested."); In re Cutright, 2012 WL 1945703, at *4 (Bankr. E.D. Va. May 30, 2012) ("[I]f reopening a case would be futile because the moving party could not achieve the objective underlying the motion to reopen, the motion should be denied.").

Therefore, the Court shall address whether it would be an exercise in futility to grant the Debtors' Motion.  The decision hinges on the following: if the Motion is granted and the Debtors' cases are reopened, could the Debtors, as a matter

of law, obtain relief from the Order by: (i) filing a motion pursuant to Rule 60(b)(3); or (ii) filing an independent action under Rule 60(d)(1)?  If the Debtors are not, as a matter of law, able to obtain relief from the Order, they will not be able to modify their plan of reorganization so reopening their bankruptcy cases would be futile and serve no purpose.

## I.   Relief from the Order Pursuant to Rule 60(b)(3)

### A.  One Year Deadline Pursuant to Rule 60(c)(1)

Motions under Rule 60(b)(3) must be filed no more than a year after the entry of the order which is the subject of the motion.  See Fed. R. Civ. P. 60(c)(1). The Order at issue was entered on November 17, 2011, so one year from that date was November 17, 2012.  It is undisputed that the Debtors' Motion to reopen was filed more than two months after that date.  Therefore, it would be futile for the Court to reopen the record for the purpose of allowing the Debtor to file a Rule 60(b)(3) motion since it is time-barred from doing so.

### B.  Equitable Tolling

The Debtors contend that the one year time period set forth in Rule 60(c)(1) can be equitably tolled.  Without deciding whether equitable tolling applies to Rule 60(c)(1), the Court concludes that equitable tolling, which is an extraordinary remedy, see Kach v. Hose, 589 F.3d 626, 645 (3d Cir. 2009), would not be applicable here.  "Equitable tolling is not warranted where the moving party has not exercised due diligence."  G & G Investments, Inc. v.

Buschmeier, 4929081, at *7 (W.D. Pa. Nov. 30, 2010); see also Miller v. Harlow,

2013 WL 638623, at * 3 (E.D. Pa. January 22, 2013) ("The limitations period is

subject to equitable tolling but only where extraordinary circumstances prevented

the petitioner from filing on time and where the petitioner pursued his rights

diligently.").

         The Debtors have possessed the documents which Sovereign produced to

them since before they entered into the Settlement Agreement in November of

2011.  At any time, the Debtors could have conducted another, or a more diligent,

review of the documents with a focus on whether the "scarcity" of pre-February

28, 2008 documents made any sense. They did not do so until Mr. Coren was

retained in the Guaranty Action.  When he reviewed the documents, he noticed

the absence of the documents under discussion. The Debtors have not alleged or

demonstrated that Mr. Coren had any additional information about the facts

regarding this matter than Mr. Ciardi had when he reviewed the documents.  The

only difference is that, in conducting his inspection, Mr. Coren was more diligent

and exacting.  Yes, he had the benefit of Judge Raslavich's decision in 400

Walnut Associates, L.P. when he conducted his review but, like the debtor in the

adversary proceeding before Judge Raslavich, the Debtors could have uncovered

Sovereign's discovery misconduct had the absence of such documents been of

particular concern to them.[16] The Debtors' contention that they were prevented

from timely filing their Rule 60(b)(3) motion within the one year time limitation

lacks merit. Judge Raslavich's decision merely raised the Debtors' antennas and

motivated them to retain Mr. Coren to take another look at Sovereign's document

production since the Debtors and the Guarantors are currently focused on:

(i) finding a way around or out of the Release which was included in the

Settlement Agreement; and (ii) obtaining a second bite at drafting and negotiating

a confirmable plan of reorganization.

Moreover, applying the Debtors' rationale, they would be entitled to have

the one year deadline in Rule 60(c)(1) equitably tolled until whenever Judge

Raslavich issued his decision in 400 Walnut Associates, L.P. and they retained

Mr. Coren to review the documents which Sovereign produced in their bankruptcy

cases and pursue the matter against Sovereign, regardless of when these events

occurred.  The Court finds this viewpoint at odds with the "due diligence"

requirement for equitable tolling.

Furthermore, as of August 21, 2012, the Debtors had actual knowledge

(thanks to Mr. Coren's detailed review of Sovereign's document production) that

---

[16] Mr. Coren's pursuit of discovery from Sovereign led to the revelation that
Sovereign's shared drives had not been searched during the Debtors' bankruptcy
cases in response to the Request for Documents.  If the Debtors' counsel had
competently and diligently pursued the absence of documents from pre-February
28, 2008, *during the Debtors' bankruptcy cases* (in the same fashion that Mr.
Coren has done now) the revelation regarding Sovereign's failure to search the
shared drives presumably would have occurred at that time.

Sovereign had failed to produce relevant documents in response to the Debtors'

Request for Documents.  See Joint Exhibit 13, at ¶ 1, ¶ 31 n.2 & ¶ 33 n.3.  At that

point in time, the Debtors could have filed the Motion and asked the Court for

leave to expeditiously conduct discovery for the purpose of timely filing a Rule

60(b)(3) motion.[17] They failed to do so and seemingly let the one year deadline in

Rule 60(c)(1) expire without any fanfare.  See Brown v. Shannon, 322 F.3d 768,

774 (3d Cir. 2003) (equitable tolling not applicable where petitioner, whose

counsel withdrew his appearance, had "nearly one month left in the limitation

period" during which he could have prepared and filed at least a basic *pro se*

habeas petition).[18]  On January 22, 2013, the Debtors finally filed their Motion.  A

review of the Motion reveals that all of the factual allegations asserted therein

relate to events or conduct occurring on or before August 21, 2012.  Had the

Debtors been exercising reasonable diligence, they would have filed their Motion

---

[17] Had the Debtors moved to reopen their bankruptcy cases in or about August of 2012, the time period for filing a motion under Rule 60(b)(3) would not have expired. Consequently, at that time, reopening their bankruptcy cases to allow them to expeditiously conduct discovery and file a Rule 60(b)(3) motion would not have been futile.

[18] Mr. Coren blamed the delay on filing the Motion on: (i) the need to find new bankruptcy counsel for the Debtors to replace Mr. Ciardi's firm in anticipation of Mr. Ciardi needing to testify in support of the Motion; and (ii) the interruption of the holidays in December of 2012 and early January of 2013.  However, Mr. Ciardi could have filed the Motion and then new counsel could have been retained.  In the alternative, Mr. Coren could have filed the Motion.  Since his focus in bankruptcy is on litigation, one presumes he knows how to preserve his ability to maintain a cause of action in a timely fashion.

on or shortly after August 21, 2012.  They failed to so.  Therefore, the doctrine of equitable tolling is inapplicable here.

In sum, the Debtors failed to file a Rule 60(b)(3) motion within the one year period for doing so.  Even if equitable tolling could apply to the deadline set forth in Rule 60(c)(1), it would not be applicable here.  Based on the Debtors' inability to timely file a motion under Rule 60(b)(3), it would be futile to allow them to reopen their bankruptcy cases for that purpose.

## C.  Substantive Requirements for Relief

Even assuming the Debtors *could* timely file a Rule 60(b)(3) motion, it would be extremely unlikely that they would be successful in obtaining relief in their favor.  A movant seeking relief from a final judgment, order or proceeding under Rule 60(b) "carries a heavy burden" since such motions are viewed as requesting "'extraordinary relief which should be granted only where extraordinary justifying circumstances are present.'"  Kiburz v. Secretary, U.S. Dept. of Navy, 446 Fed. Appx. 434, 436 (3d Cir. October 3, 2011) (*quoting* Bohus v. Beloff, 950 F.2d 919, 929 (3d Cir. 1991)).  Moreover, when a movant has "made a free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment[,] their burden under Rule 60(b) is perhaps even more formidable than had they litigated and lost." Philadelphia Welfare Rights Organization. v. Shapp, 602 F.2d 1114, 1120 (3d Cir.1979).

Rule 60(b)(3) allows a court to relieve a party from an order for fraud, misrepresentation or misconduct by an opposing party.  Fed. R. Civ. P. 60(b)(3).

In <u>Stridiron v. Stridiron</u>, 698 F.2d 204 (3d Cir. 1983), the Third Circuit observed

that a "[f]ailure to disclose or produce evidence requested in discovery *can*

constitute Rule 60(b)(3) misconduct." <u>Id.</u> at 207 (emphasis added).  However, not

every failure to disclose or produce discovery qualifies as misconduct under Rule

60(b)(3).  <u>Floorgraphics Inc. v. News America Marketing In-Store Services, Inc.</u>,

434 Fed. Appx. 109, 112  (3d Cir. April 20, 2011).  In determining whether a

party's failure to disclose or produce discovery constitutes "misconduct" under the

meaning of Rule 60(b)(3), courts consider the following three factors: (i) the

requests propounded; (ii) the response by the movant's adversary; and

(iii) whether the movant "resorted to a motion to compel or a request for sanctions

as permitted by the federal rules." <u>Id.</u> at 112.

Even if misconduct exists for purposes of Rule 60(b)(3), relief is not

available unless: (i) the misconduct prevented the movant from fully and fairly

presenting its case," <u>Stridiron v. Stridiron</u>, 698 F.2d 204, 207 (3d Cir. 1983);

(ii) the misconduct was material to the outcome of the case, <u>Bandai America Inc.</u>

<u>v. Bally Midway Manufacturing Co.</u>,, 775 F.2d 70, 73 (3d Cir. 1985), and (iii) there

is "no indication of neglect on the party of the moving party in pursuing the facts,

<u>id.</u>.

### 1. Discovery Misconduct

#### (a) The Debtors' Request for Documents

The Debtors' Document Request consists of 8 individual requests.  While a

few of the requests seek particular types of documents including appraisals and

valuations, the majority of the requests are broad but generally straightforward.

*(b) Sovereign's Response and Document Production*

In responding to the Debtor's Request for Documents, Sovereign failed to:

(i) search and produce relevant documents from the shared drive; and (ii) include

a specific objection in its response to restoring and searching documents on its

backup tapes.  Both of these failures were preventable.

The failure to search and produce relevant documents from Sovereign's

shared drive was the result of incompetence.  Whenever a request for production

is served on Sovereign, the Sovereign employee who assists Sovereign's counsel

in gathering documents in response to the requests, should be entirely capable of

identifying the sources of Sovereign's documents, including its electronically

stored information, for outside counsel. Similarly, a lawyer handling a discovery

production on behalf of a client should have sufficient experience and expertise to

ask the proper questions to ensure that he or she is aware of all potential sources

of documents that are relevant to the document production at issue.

Dilworth's failure to include an objection to producing the backup tapes in

Sovereign's response to the Debtors' Request for Documents was also

preventable. First, Dilworth was clearly aware of the significance of the objection

since, according to the Associate, it was discussed at a meeting on July 5, 2011

and he listed it as a specific "to do" item on the Discovery Action List which he

36

formulated following the meeting.  See Joint Exhibit 12.  The Associate sent the

aforementioned list by email for review by a partner at the Dilworth firm who

responded stating that the list "looks good[.]"  See Joint Exhibit 12; H.T. 2/19/13

at 62-63.  Second, Sovereign's response to the Debtors' Request for Documents

is only six pages long.  Sovereign specifically objected to seven of the requests

on a *single* ground, namely that a term or terms in the request was\were "vague

or ambiguous" or that the request "would require the production" of documents

protected by the attorney-client or work-product privileges.  No other specific

objections were made. The point which the Court is making is that Sovereign's

response was short and uncomplicated.  In other words, it should have been easy

to review. Given the fact that documents pre-dating February 28, 2008 were

patently within the scope of the Debtors' Request for Documents, the omission of

the objection from Sovereign's response was not a trivial omission and its

absence from the response should have been immediately and easily noticeable

to the Associate, Mr. James Hennessey (the partner at Dilworth who reviewed the

response and whose electronic signature appears thereon), HT 2/19/13 at 66-67,

and any other Dilworth attorney who was knowledgeable about the document

production and reviewed the response. Moreover, the response should have

been reviewed in conjunction with the Discovery Action List to ensure that the

tasks on the list had been performed.

The Court fully understands that "to err is human." Alexander Pope, *An Essay on Criticism*, in Collected Poems 58, 71 (Bonamy Dobree ed., Everyman's Library 1983) (1711). However, the errors by Sovereign and its counsel should not have occurred. The errors are the result of incompetency and reckless conduct.

Between the incompetent and reckless discovery foul-up here and the discovery abuse in the adversary proceeding before Judge Raslavich, Sovereign and its counsel (whether Dilworth or another firm) would do well now and in the future to pay attention, and devote the necessary time and expense, to fully and properly responding to discovery requests. "[C]omplete and accurate responses to discovery are required for the proper functioning of our system of justice." JPMorgan Chase Bank, N.A. v. Neovi, Inc., 2006 WL 3803152, at *5 (S.D. Ohio Nov. 14, 2006) (*quoting* Wagner v. Dryvit Systems, Inc., 208 F.R.D. 606, 609 (D. Neb. 2001). Sovereign's tarnished reputation and lack of credibility in responding to discovery should clearly be a topic of grave concern to the bank.

### (c) The Debtors' Action or Inaction

At the evidentiary hearing on February 19, 2013, Mr. Ciardi testified that, during the Debtors' bankruptcy cases, he had noticed that the documents which Sovereign produced "from the time of Nordbank's first involvement on or before January, 2007, to its exit in March of 2008" were "sparse." HT 2/19/13 at 96. Moreover, according to the Motion to Extend Scheduling Deadlines which was

filed in the Guaranty Action, Sovereign's production of documents in the Debtors'

bankruptcy case was "essentially <u>devoid</u> of: (1) correspondence between

Sovereign and Nordbank from the time of Nordbank's first involvement thru its

exit in March 2008; and (2) correspondence and other internal Sovereign

documents for most of the calendar year 2007," despite the fact "that the

Remediation Loan closed on January 16, 2007, and discussions surrounding the

follow-up $181.5 million construction financing were ongoing thereafter." Joint

Exhibit 14 at 6–7 n.2 (emphasis added). Based on this analysis of the

documents, Sovereign's failure to produce all documents relevant to the Debtors'

document request was indisputable and conspicuous.

The Debtors could have raised these issues concerning the deficiencies in

Sovereign's document production with Sovereign. They never did so.   HT

2/19/13 at 65, 97. They could have also filed a motion to compel against

Sovereign, pointing out the significant absence of documents and explaining the

reason that such documents must either exist or have been destroyed.  They

never filed a motion to compel.  Id. at 65.  Consequently, it is difficult to conclude

that Sovereign's discovery conduct would qualify as "misconduct" for purposes of

Rule 60(b)(3).

## 2.  The Other Factors

However, even assuming that Sovereign's failure to disclose or produce

documents in response to the Debtors' Request for Documents constitutes

misconduct within the meaning of Rule 60(b)(3), the other factors which are pertinent to whether a movant is entitled to relief under the rule weigh against the Debtors.

### (a) Materiality

First, it is implausible to this Court, based on Mr. Ciardi's admission that he was aware that Sovereign had produced scant documents for a time period when many documents should have existed and his decision not to take any action with regard to their omission, that the documents were material to the Debtors in deciding whether to enter into a settlement agreement with Sovereign and, if so, on what terms.

In the Debtors' motion for Court approval of the Settlement Agreement, they stated, in relevant part, that "the settlement allows the Debtor[s] to avoid the costs and delay of pursuing discovery and litigation with the bank, as well as the uncertainty of the outcome of such litigation" and that "resolution of the litigation between the Debtor[s] and the Bank will allow the Debtor[s] to focus on closing the proposed sale to Makemie, confirming a Plan of Reorganization, and emerging from bankruptcy."   Docket Entry No. 157 ¶¶ 22-23.  In these statements, the Debtors identified the material factors which motivated them to negotiate the settlement with Sovereign:

> (i) the Debtors wanted to avoid the cost and delay of
> pursuing further discovery and litigation with Sovereign;

40

(ii) the Debtors wanted to settle the litigation with
Sovereign so they could focus on closing the sale to
Makamie; and

(iii) settling with the Bank provided the Debtors with the
ability to obtain a confirmed plan of reorganization and
emerge from bankruptcy.

Accordingly, the Debtors' own words establish that their interest was in obtaining

a settlement with Sovereign so they could move forward and reorganize rather

than on pursuing further discovery and litigating with Sovereign.  Accordingly,

while Mr. Ciardi noticed that Sovereign had failed to produce documents which

were relevant to their document requests, the documents were not significant to

the Debtors' goal of settling with Sovereign.  If they had been, then the Debtors

would have pursued obtaining them.

### (b) Neglect

Based on Mr. Ciardi's testimony, it is clear that the Debtors reviewed the

documents which Sovereign produced.  They raised certain, specific objections

with Sovereign regarding the production.  However, despite the noticeable

paucity of documents for a specific time period (*i.e.,* pre-February of 2008) and

between particular parties (*i.e.,* Sovereign and Nordbank), the Debtors chose not

to raise an issue with Sovereign with regard to the absence of these documents.

Therefore, the Debtors are responsible for not taking action during their

bankruptcy cases to obtain the documents which they now contend prevented

them from fully and fairly presenting or evaluating their case.

41

(c)    *Whether the Debtors were Prevented
from Fully and Fairly Litigating their Case*

Lastly even if Sovereign committed misconduct within the meaning of Rule

60(b)(3), it did not prevent the Debtors from fully and fairly litigating their case.

The Debtors desired a settlement with Sovereign.  The settlement which they

negotiated enabled them, if events transpired as planned, to reorganize and

emerge from their bankruptcy cases relieved of their debt to Sovereign.

## D. Summary

Even if the Court granted the Debtors' Motion and reopened their

bankruptcy cases, they would not be entitled to relief under Rule 60(b)(3)

because they could not timely file a motion thereunder, would not be legally

entitled to have the deadline equitably tolled and could not satisfy the substantive

requirements for relief under the rule. Accordingly, no purpose would be served

by reopening their bankruptcy cases and allowing them to file a Rule 60(b)(3)

motion.

## II.    Independent Action Under Rule 60(d)(1)

The Debtors also seek to have their bankruptcy cases reopened so that

they may file an independent action against Sovereign pursuant to Rule 60(d)(1).

However, in United States v. Beggerly, 524 U.S. 38, 47 (1998), the Supreme

Court ruled that an independent action under Rule 60 is available only "to prevent

a grave miscarriage of justice."

42

In Beggerly, the United States brought a quiet title action against the Beggerlys and other defendants. Beggerly v. United States, 114 F.3d 484, 485 (1977), rev'd, 524 U.S. 38 (1998). During discovery in the quiet title action, the Beggerlys sought proof of their title to a portion of land on Horn Island. Id. Government officials "ostensibly conducted a thorough search of the public land records" and "formerly represented to the Beggerlys and the district court that no part of Horn Island had ever been granted to a private landowner[.]" Id. at 486. Based on the government's erroneous representations, the United States persuaded the Beggerlys to accept the settlement agreement which it proposed. Id. In return for a payment of $208,175.87, the Beggerlys agreed that title to the land would be quieted in favor of the United States. The district court entered a judgment based on the settlement. Id.

The Beggerlys' disappointment with the settlement led them to "mount an exhaustive search" for evidence of their ownership of the land. Id. "They wrote letters to public officials, made Freedom of Information Act requests, and searched land records in Alabama, Mississippi, Louisiana and Washington, D.C." Id. In 1991, they finally hired a genealogical record specialist to conduct research in the National Archives in Washington. Beggerly v. United States, 524 U.S. at 41. The specialist found materials that supported the Beggerlys' position that they had title to the land. Beggerly v. United States, 114 F.3d at 486. Government officials had reportedly searched the National Archives during the

quiet title action but had not discovered the materials which the specialist found.
Id.

Armed with this new information, the Beggerlys filed an action in the district
court seeking to set aside the consent judgment and to recover just
compensation for the land from the United States.  Id.  The district court
concluded that it was without jurisdiction to hear the Beggerlys' suit and
dismissed the complaint, Beggerly v. United States, 524 U.S. at 41, but the Court
of Appeals of the Fifth Circuit reversed.  It concluded that the Beggerlys' lawsuit
satisfied the requirements of an "independent action" under Rule 60, which meant
that a jurisdictional base existed for the lawsuit.  Id. It then considered whether
the settlement agreement could be set aside and addressed the issue of whether
the applicable 12-year statute of limitations, which began to run from the date the
plaintiff knew or should have known about the claim of the United States, 28
U.S.C. § 2409a(g), could and should be equitably tolled. Id. at 41-42. The Court
of Appeals concluded yes on both issues. Relying on the Beggerlys' new
evidence, the Court of Appeals ruled that they had valid title to the land at issue.
It, therefore, vacated the settlement agreement and remanded the case to the

District Court with instructions to enter judgment quieting title in the Beggerlys'

favor. Id. at 42. In so ruling, the Fifth Circuit declared:

> The government possessed a document that was vital to
> the Beggerlys' claim of title to the land they had
> acquired on Horn Island. Notwithstanding, it
> represented to the Beggerlys and the district court that
> no evidence existed that Horn Island had ever been
> privately owned. This representation precipitated the
> Beggerlys' involuntary settlement of the government's
> lawsuit. Their inability to prove their title was directly
> caused by the government's failure to produce the grant
> and its misrepresentation that no private disposal had
> ever been made. Equity permits us to correct injustice in
> extraordinary and unusual circumstances as are here
> presented.

Id. at 488 (emphasis added).

On appeal, the Supreme Court reversed, concluding that the requirements

for an independent action under Rule 60 had not been met. In so ruling, the

Supreme Court stated:

> If relief may be obtained through an independent action
> in a case such as this, where the most that may be
> charged against the Government is a failure to furnish
> relevant information that would at best form the basis for
> a Rule 60(b)(3) motion, the strict 1-year time limit on
> such motions would be set at naught. Independent
> actions must, if Rule 60(b) is to be interpreted as a
> coherent whole, be reserved for those cases of
> "injustices which, in certain instances, are deemed
> sufficiently gross to demand a departure" from rigid
> adherence to the doctrine of res judicata. Hazel-Atlas
> Glass Co . v. Hartford-Empire Co., 322 U.S. 238, 244
> (1944).

524 U.S. at 46. Elaborating further on its view of independent actions under Rule

45

60, the Supreme Court opined:

> [A]n independent action should be available only to
> prevent a grave miscarriage of justice. In this case, it
> should be obvious that respondents' allegations do not
> nearly approach this demanding standard. Respondents
> allege only that the United States failed to "thoroughly
> search its records and make full disclosure to the Court"
> regarding the Boudreau grant. Whether such a claim
> might succeed under Rule 60(b)(3) we need not now
> decide; it surely would work no "grave miscarriage of
> justice," and perhaps no miscarriage of justice at all, to
> allow the judgment to stand.

Id. at 47 (emphasis added).

The facts in Beggerly are not dissimilar from the facts of the instant matter.

If anything, the circumstances in Begggerly provide a much more persuasive

basis than the facts here for concluding that an independent action was

necessary to prevent a grave miscarriage of justice.

The Debtors in the instant case had the opportunity to engage in discovery

before entering into the Settlement Agreement. Their bankruptcy counsel was

aware that Sovereign had produced a scarcity of documents from pre-February of

2008. If the absence of such documents had been a material factor to him or the

Debtors in deciding whether and on what terms to negotiate a settlement with

Sovereign, the Debtors had avenues available to them to press Sovereign on its

inadequate document production. Indeed, the Debtors' counsel raised certain

issues with Sovereign regarding the production. However, none of the issues

dealt with the absence of documents pre-dating February of 2008. Instead, the

46

Debtors' counsel focused on: (i) the issues that were material to the Debtors in negotiating the Settlement Agreement; and (ii) obtaining a confirmed plan of reorganization which would enable the Debtors and the Guarantors to emerge from bankruptcy without being indebted to Sovereign for the Remediation Loan.

Ultimately, an event of default occurred under the Settlement Agreement which changed the course of the Debtors' reorganization, which is unfortunate not only for the Debtors and the Guarantors but also for the other parties and creditors in their bankruptcy cases. The Debtors and Guarantors, once again, find themselves up against Sovereign in the Foreclosure and Guarantor Actions but, this time, the Release to which they agreed in the Settlement Agreement restricts their options.

Nevertheless, based on Beggerly, these circumstances do not constitute a grave miscarriage of justice. Despite Sovereign's failure to fully and completely respond to the Debtors' Request for Documents, allowing the Debtors to pursue an independent action against Sovereign under Rule 60(d)(1) is unnecessary to prevent a "grave miscarriage of justice." Therefore, it would be futile to reopen the Debtors' bankruptcy cases to allow them to file an independent action against Sovereign under Rule 60(d)(1).

## SUMMARY

The Debtors' Motion shall be denied because no purpose would be served by reopening the Debtors' bankruptcy cases.  The Debtors are not legally entitled to pursue a motion under Rule 60(b)(3) because the one year deadline for filing such a motion has expired and the doctrine of equitable tolling would be inapplicable based on the Debtors' failure to diligently exercise their rights.  Moreover, the Debtors would not be entitled to pursue an independent action under Rule 60(d)(1) because, as a matter of law, they cannot satisfy the standard required for such an action.

An Order consistent with this Opinion shall be issued.

9-26-13

JEAN K. FITZSIMON
United States Bankruptcy Judge

Copies to:

James W. Hennessey, Esquire
Patrick M. Northen, Esquire
Jennifer L. Maleski, Esquire
Catherine G. Pappas, Esquire
Dilworth Paxson LLP
1500 Market Street, Suite 3500E
Philadelphia, PA  19102

Joseph A. Dworetzky, Esquire
Ashely M. Chan, Esquire
Matthew A. Hamermesh, Esquire
Hangley  Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, PA  19103

Steven M. Coren, Esquire
Benjamin M. Mather, Esquire
Andrew J. Belli, Esquire
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA  19103

George Conway, Esquire
Office of the U.S. Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

Joan Ranieri
Courtroom Deputy